MISSOURI HOSPITAL ASSOCIATION,
and Associated Industries of
Missouri, Respondents,

v.

AIR CONSERVATION COMMISSION,
et al., Appellants.

No. WD 47706.

Missouri Court of Appeals,
Western District.

Feb. 8, 1994.

Motion for Rehearing and/or Transfer to
Supreme Court Denied March 29, 1994.

Application to Transfer Denied
May 26, 1994.

Jeremiah W. (Jay) Nixon, Atty. Gen., Timothy P. Duggan, Asst. Atty. Gen., Jefferson City, for appellants.

Lori Levine, Jefferson City, for Missouri Hosp. Ass'n.

Julie A. Emmerich, St. Louis, for Associated Industries of Missouri.

Before TURNAGE, C.J., and ULRICH and ELLIS, JJ.

ELLIS, Judge.

The Air Conservation Commission of Missouri (Commission) and the Missouri Department of Natural Resources (Department), hereinafter collectively referred to as the "State," appeal an order of the Circuit Court of Cole County granting summary judgment for declaratory and permanent injunctive relief to the Missouri Hospital Association (MHA) and Associated Industries of Missouri (AIM), referred to jointly as the "Associations" hereinafter, in their challenge to the validity of two rules governing waste incinerators. We affirm.

On September 6, 1991, the Associations filed suit to challenge two rules promulgated by the Commission: 10 CSR 10–6.160 and 10 CSR 10–6.190. (For ease of analysis, throughout this opinion 10 CSR 10–6.160 will be referred to as Rule 160 and 10 CSR 10–6.190 will be referred to as Rule 190.) An amended petition reflecting the 1992 amendments to §§ 643.050 and 643.055[1] was filed on January 19, 1993. The State filed an answer to the amended petition on January 26, 1993, and on February 8, 1993, the parties submitted a lengthy and detailed Stipulation of Facts. Both parties subsequently filed Motions for Summary Judgment, and on March 11, 1993, the trial court entered an order granting the Associations' Motion for Summary Judgment. In its order, the trial court made a specific finding that Rules 160 and 190 were void and of no force or effect. The order also permanently enjoined the State from enforcing those two rules.

When summary judgment is granted, we must read the record on appeal in the light most favorable to the party against whom judgment was entered, and accord that party the benefit of every doubt. *Germania Bank v. Thomas,* 810 S.W.2d 102, 105 (Mo.App. 1991). Likewise, we must sustain the summary judgment upon any reasonable legal basis, even if the trial court reached the correct result for incorrect reasons. *Ernst v. Ford Motor Co.,* 813 S.W.2d 910, 915 (Mo. App.1991).

The parties do not dispute the facts. Chapter 643, RSMo, establishes the Commission and charges it with protecting the quality of Missouri's ambient, or outside, air. Pursuant to the authority given to its director in § 643.060, the Department, through the Air Pollution Control Program within its Division of Environmental Quality, provides technical support for the Commission. The Commission is granted authority to promulgate and adopt rules and regulations. Relying on its rulemaking authority, the Commission promulgated the two rules in question: Rule 160, regulating medical waste and solid waste incinerators; and Rule 190, which regulates sewage sludge and industrial waste incinerators.

Both rules contain provisions relating to incinerator design and operation controls, emissions limitations for specified air pollutants, operator training, performance testing methods, exemptions and compliance schedules. Under both rules, new waste incinerators coming on line after their effective dates are required to be in compliance upon startup, but operators of incinerators in existence before the rules became effective are allowed additional time to bring them into compliance. For existing medical and solid waste incinerators, compliance with most provisions of Rule 160 was required by June 10, 1993,

---

1. Unless otherwise noted, all Missouri statutory references are to RSMo Supp.1992 and all U.S.C.A. citations are to the 1993 supplement.

except for certain emissions limitations which must be met by June 10, 1996. All existing medical and solid waste incinerators must comply with the requirements for new incinerators by January 1, 2000. In addition, existing industrial waste and sewage sludge incinerators were to be in compliance with Rule 190 by December 1, 1993.[2]

The court below found both rules to be void and of no force or effect. It did so upon two separate grounds. First, it found that because the State failed to comply with the provisions of § 536.200 and § 536.205, RSMo 1986, in promulgating and adopting the rules, they were void as expressly provided by both statutes. The court also determined that § 643.055, RSMo 1986, places a limitation on the Commission's rulemaking power, and it did not have authority to adopt Rules 160 and 190. As a result, the trial court concluded the rules were void because they were adopted without proper legislative authorization. On appeal, the State argues that the court erred in making those twin determinations.

## I.

In 1978, the General Assembly added an important element to the rulemaking process called the "fiscal note." There are two types of fiscal notes: one for rules requiring public funds to be spent or redirected, governed by § 536.200; and one for rules requiring an expenditure of funds by private persons or entities, governed by § 536.205.

If a state agency proposes to adopt, amend or rescind a rule which will "require or result in an expenditure of public funds by or a reduction of public revenues for that agency" or any other state agency or political subdivision, a fiscal note is required if the change is

estimated to cost "any category" of such public entities more than $500 in the aggregate.[3] § 536.200.1. The statute mandates that the fiscal note be filed with the Secretary of State at the time the notice of proposed rulemaking is filed. *Id.* The fiscal note, which must estimate in detail "the cost to each affected agency or to each class of the various political subdivisions to be affected," also has to be supported with an affidavit by the director of the department to which the proposing agency belongs declaring that in his opinion the estimate is reasonably accurate. *Id.* Finally, § 536.200.3 requires that the "estimated cost in the aggregate" of compliance with the new, modified, or repealed rule be published in the Missouri Register contemporary with and next to the notice of proposed rulemaking.[4] An agency's "failure to do so shall render any rule promulgated thereunder void and of no force or effect." *Id.*

■ Although its provisions are somewhat different, § 536.205 reflects a similar concern about the economic impact of rules on the private sector. It requires state agencies to file a fiscal note with the Secretary of State along with the notice of proposed rulemaking if the rule change "would require an expenditure of money by or a reduction of income for any person, firm, corporation, association, partnership, proprietorship or business entity of any kind or character" of more than $500 in the aggregate.[5] § 536.205.1. The note must contain an estimate, by class, of the number of persons, firms, etc. which would likely be affected; a classification by type of business entity so as to give reasonable notice of the number and kind of businesses which would likely be affected; and

2. MHA represents approximately 160 hospitals, an estimated 67 of which operate incinerators, and the rest of which contract for incinerator use to dispose of infectious waste. AIM has approximately 1700 members from various industries, and estimates that 57 members may be affected by the incinerator rules.

3. Otherwise, the director of the department to which the agency proposing the rule belongs must file an affidavit with the Secretary of State stating that the proposed change will cost less than $500 "in the aggregate to all categories" of

state agencies and political subdivisions. § 536.-200.1.

4. This must be done even if a fiscal note is not required.

5. If, on the other hand, a fiscal note is not required because the proposed rule is estimated to cost $500 or less in the aggregate to any such private entity or entities, the agency need take no other action. However, it would be prudent for the agency to publish this determination to avoid possible misunderstandings.

an estimate of the aggregate cost of compliance for the likely affected entities. §§ 536.-205.1(1)–(3). If a fiscal note is required due to the proposed rule's aggregate effect on private finances, § 536.205.2 mandates that *the fiscal note itself* be published contemporary with and next to the notice of proposed rulemaking in the Missouri Register. If the state agency fails to publish the fiscal note, "any rule promulgated thereunder [is] void and of no force and effect." *Id.*

### Rule 160

█ The Commission initially proposed Rule 160 on April 18, 1990, and it first appeared in the Missouri Register on May 1, 1990. However, this version of Rule 160 was withdrawn in August, 1990. A revised Rule 160, which was proposed on October 16, 1990, appeared in the Missouri Register on November 1, 1990. The final rule was published in the Code of State Regulations on May 31, 1991, and became effective on June 10, 1991.

An affidavit signed by the director of the Department and a fiscal note pertaining to public entities were filed along with the initial version of Rule 160 on April 18, 1990. The note declared the "affected agencies" to be the Missouri Department of Natural Resources, St. Louis City, St. Louis County, the Springfield and Kansas City Air Pollution Control Agencies, the Missouri Department of Health, and "various other city and local agencies." It gave this estimate of the public cost of compliance with Rule 160: $0 for the remainder of the fiscal year in which the proposed rule was filed (fiscal year 1990, ending June 30, 1990); and $102,800 for fiscal year 1991 (July 1, 1990 through June 30, 1991), the first full fiscal year the rule was to be in effect. The revised Rule 160 (which was proposed on October 16, 1990, became effective on June 10, 1991, and is the subject

of this appeal) was not accompanied by a new fiscal note.

The fiscal note filed with the original version of Rule 160 on April 18, 1990, contained no estimate of the costs of compliance to private entities. However, at the end of the proposed rule, just before the section giving notice that a public hearing on Rule 160 would be held, the following statement appears: "Private Entity Cost: This proposed rule will not cost private entities more than $500 for the remainder of FY 1990 and $1,950,000 for the FY 1991." The revised version of Rule 160, proposed on October 16, 1990, stated in the same location: "Private Entity Cost: This proposed rule will cost private entities $1,950,000 for the FY 1991."

Because Rule 160 compliance costs were estimated to exceed $500 in the aggregate to both public and private entities, the Commission was obligated to file two fiscal notes with the Secretary of State: one under § 536.200; and one under § 536.205. However, the Commission failed to comply with either statute.

█ While the initial version of Rule 160 was accompanied by a fiscal note and supporting affidavit from the director of the Department attesting to the accuracy of the cost estimates contained in the note, when the revised Rule 160 was transmitted to the Secretary of State, the Commission filed neither a fiscal note nor an affidavit. The State argues that the requirements of § 536.200.1 were met when a fiscal note and affidavit were filed with the original version of Rule 160 on April 18, 1990.[6] We reject this argument. Despite the similarities between the old and new forms of Rule 160, the fact remains that the rule to which the previously-filed fiscal note and affidavit applied was officially *withdrawn* in August, 1990.[7] The October 16, 1990, version of Rule 160 at issue

6. The record contains a memorandum dated October 16, 1990, from Gerald Howard (a Department employee) to Roger D. Randolph, Staff Director, Air Pollution Control Program, saying that because the revised Rule 160 and the previous Rule 160 were so similar, there were no significant differences in compliance requirements and the cost estimates remained the same. Howard concluded that "as a result of this information, new Rule 10 CSR 10–6.160 and the

concurrent rescissions of the other four rules are being filed using the earlier filed cost affidavits."

7. In deciding this question, we assume, *arguendo*, that in promulgating Rule 160 the Commission complied with §§ 536.200.3 and 536.205.-1(3), which require that estimated compliance costs "in the aggregate" be published in the Missouri Register. This point is addressed later in the opinion.

in this case is not the same rule originally promulgated on April 18, 1990. It was a new proposed rule and triggered the fiscal note and affidavit requirements of § 536.200.1.

■ The Commission also failed to comply with the mandates of § 536.205 when it adopted Rule 160. Here, the Commission published two separate "private entity cost" estimates: one for the original version of Rule 160, and one for the revised version. However, neither estimate constitutes a fiscal note as contemplated by § 536.205.1. There was no estimate of the number of persons, firms, corporations, etc. by class which might be affected by adoption of Rule 160, nor was there a classification of the types of business entities that might be affected as required by §§ 536.205.1(1)–(2). Furthermore, no fiscal note was published in the Missouri Register "contemporary with and adjacent to the notice of proposed rulemaking" on either occasion as required by § 536.205.2. We therefore conclude that because it did not make a comprehensive and diligent effort to determine all private entities that would likely be affected and did not estimate the number of such entities by class in a manner giving them reasonable notice they would be affected, in adopting Rule 160 the Commission failed to meet its obligations under § 536.205.

### Rule 190

■ The substance of Rule 190 was first included in the initial draft of Rule 160 proposed on April 18, 1990. After the August, 1990, withdrawal of the original version of Rule 160, Rule 190 was promulgated as a separate rule on September 5, 1990, and appeared in the Missouri Register on September 17, 1990. It was published in the Code of State Regulations on March 4, 1991, and became effective on March 14, 1991.

Attached to Rule 190 as transmitted to the Secretary of State on September 5, 1990, were an affidavit from the director of the

Department and a document containing a cost projection. This document, which recited that the affected state agencies and political subdivisions were the Missouri Department of Natural Resources, St. Louis County, the St. Louis and Springfield Air Pollution Control Agencies, the Kansas City Health Department, the Missouri Department of Health, "and various other city and local agencies," contained an estimate that Rule 190 compliance costs for the Department would be "less than $500" for the fiscal years 1990 (which had concluded on June 30, 1990, some two months earlier) and 1991. It did not include an estimate of the compliance costs for any listed state agency or political subdivision other than the Department. As far as costs to the private sector, near the end of the proposed Rule 190 there was an estimate that it would not cost private entities more than "$500 in the aggregate."

Here, too, the Commission failed to comply with either § 536.200 or § 536.205. Section 536.200.1 compels state agencies engaging in rulemaking activities to estimate "the cost to each affected agency or to each class of the various political subdivisions to be affected" by the new, modified, or repealed rule. However, the estimated cost of compliance was computed for only one such public entity affected by Rule 190: the Department. The Commission therefore violated § 536.200.1 in promulgating Rule 190.[8] Furthermore, the document accompanying Rule 190 failed to properly identify many affected agencies. For instance, the record shows that there are approximately 24 sewer districts in Missouri which would incur substantial costs in complying with Rule 190 and which are explicitly referred to in § 536.200.1 as political subdivisions for which such costs must be estimated.[9] Unless they fall into the general category of "various other city and local agencies," which we doubt, the cost estimate filed with Rule 190 did not even mention those districts

---

8. The only time a fiscal note is not required under § 536.200.1 is when the director of the department to which the promulgating agency belongs files an affidavit stating that "the proposed change will cost less than five hundred dollars in the aggregate to *all* categories" of public entities affected. § 536.200.1 (emphasis added).

9. Section 536.200.1 brings within its scope counties, cities, towns, and villages. It also covers school, road, drainage, sewer, water, levee, "or any other special purpose district[s]" affected by the proposed rule.

as "affected agencies." In either event, the document contained no estimate of compliance costs for those sewer districts, or, for that matter, any other "affected" agency, whether listed or unlisted. We therefore conclude that in promulgating Rule 190 the Commission did not fulfill its obligations under § 536.200 to make a comprehensive and diligent attempt to identify and list all the state agencies and political subdivisions that would be affected thereby, and to make a reasonable, realistic, good faith effort to estimate the cost in the aggregate to each affected state agency and category of political subdivision.

■ Furthermore, the private entity cost estimate found at the end of the proposed Rule 190 violates § 536.205. The State argues that because it estimated that Rule 190 would not cost private entities more than "$500 in the aggregate," a fiscal note was not required under § 536.205.1 and the Commission cannot be faulted for failing to file one with the Secretary of State. If the cost estimate had been properly computed, we would agree. However, the record reveals that the Rule 190 compliance costs to private entities were only estimated to be less than $500 *for the first two fiscal years after its adoption.* The Commission believed then and apparently still believes it could satisfy § 536.205 by estimating compliance costs for two fiscal years: the fiscal year in which Rule 190 was adopted, and the following fiscal year. Operating under this premise, the Commission reasoned that a nominal two-year cost estimate was appropriate since private entities were not required to comply with Rule 190 until December 1, 1993, which was more than three years away at the time Rule 190 was promulgated.[10]

We emphatically repudiate this reasoning. To begin with, such an approach would allow agencies to eviscerate § 536.205 simply by setting a proposed rule's implementation or compliance date more than two years in the future. More fundamentally, however, the

State's approach raises a question about the meaning of § 536.205.1, which requires agencies to make a threshold determination as to whether a proposed rule would cost private entities more than $500 "in the aggregate," and § 536.205.1(3), which states that when a fiscal note is necessary, agencies must make an "estimate in the aggregate as to the cost of compliance" with the new, amended, or rescinded rule.

■ The State's argument that it could satisfy either statute by providing compliance cost estimates for the fiscal year in which a proposed rule is filed and the first full fiscal year after adoption seems to be based on its interpretation of a manual for administrative rulemaking procedures prepared and distributed by the Office of the Secretary of State. The portions of that manual relied on by the State are contained in the record, but they do not support its position. The only information it contains which could possibly lead one to the conclusion drawn by the State is a sample fiscal note. While the sample note concerns a proposed rule (presumably hypothetical) as to which it seems all estimated costs of compliance would be incurred in two fiscal years (the year of adoption and the first full year of implementation), the manual does not say that such an estimate would be appropriate for every rule.

■ But, of course, even if the manual did support the State's position, it is the statute, not the manual, with which it must comply.[11] Words used in statutes are to be given their plain and ordinary meaning. *May Dep't Stores v. Director of Revenue,* 791 S.W.2d 388, 389 (Mo. banc 1990). The plain meaning of the word "aggregate" is "[e]ntire number, sum, mass, or quantity of something; total amount; complete whole." *Black's Law Dictionary* 60 (5th ed. 1979). In enacting §§ 536.205.1 and 536.205.1(3), the legislature chose to require estimates of the cost of compliance "in the aggregate." In light of the plain meaning of "aggregate," to

---

**10.** The State, by way of understatement, acknowledges in its brief that this may not have been the best approach it could have taken.

**11.** We are aware that fiscal notes and affidavits must be prepared on forms established by the

Secretary of State and that failure to use those forms will result in rejection of the filing. § 536.210, RSMo 1986. Any errors in the forms or the manual relied on by the State should be corrected promptly.

comply with these statutes, a state agency must estimate total private compliance costs measured over the lifetime of the proposed rule.[12]

We are mindful of § 536.200.2, which provides that if the cost of compliance "in the aggregate" at the close of the first full fiscal year following implementation of a rule affecting public expenditures or revenues has exceeded by 10% or more the estimated cost in the fiscal note, the promulgating agency must publish the "original estimated cost together with the actual cost during the first fiscal year" in the Missouri Register no later than ninety days after the end of the fiscal year.[13] The State argues that this provision limits the fiscal information required by § 536.205 to an estimate of the aggregate cost of compliance in the first full fiscal year of implementation. This argument has no merit. First, § 536.200.2 only applies to compliance cost estimates prepared for rules affecting state agencies or political subdivisions. There is no comparable statutory provision for rules imposing costs on *private* entities. Second, § 536.200.2 simply gives state agencies and political subdivisions an objective way to assess the accuracy of the original compliance cost estimates included in the fiscal note. So while § 536.200.2 implicitly requires that the estimated cost for a rule's first full fiscal year of implementation be stated separately, it does not excuse an agency from preparing estimates of the cost of compliance for the remainder of the time the rule will be in effect.

■ In a related argument, the State contends it is impossible to estimate or predict aggregate costs when a rule imposes long-term or ongoing costs of compliance. We disagree. Many rules adopted by state agencies are fully implemented (and all costs of compliance incurred) within the first full fiscal year after adoption. While preparation of aggregate cost estimates for rules which take longer to implement or are gradually phased in will obviously require more effort, we cannot say it would be impossible to do so. For example, when a rule requires periodic compliance expenditures, the fiscal note should designate the length of the period and the estimated aggregate cost of compliance during each period.[14] The agency should attempt to estimate the cost of compliance in the aggregate for the foreseeable future. If, however, there will be ongoing costs of compliance which for some reason cannot be estimated in a reasonable fashion, an appropriately worded statement to that effect would at least put the affected entities on notice that there are significant but unquantifiable future compliance costs. The various possibilities are myriad, but we are confident that state agency administrators are capable of preparing cost estimates which comply with both the letter and spirit of §§ 536.200 and 536.205.

■ Sections 536.200 and 536.205 are clearly designed to require agencies to take reasonable steps to consider and identify all public and private entities significantly affected by any proposed rule, and to investigate, consider and comprehensively estimate the full range of costs involved. As one commentator has observed:

12. Everything we have said here with regard to aggregate cost estimates under § 536.205 applies with equal force to those prepared to comply with § 536.200, because § 536.200.1 requires state agencies to make a threshold determination *as to whether the proposed rule is estimated to* cost more than $500 "in the aggregate" to any category of affected public entity, and § 536.-200.3 imposes a separate requirement that the "estimated cost in the aggregate" be published in the Missouri Register at the time of publication of the notice of proposed rulemaking.

13. If an affidavit was filed stating that the proposed rule would cost public entities less than $500, the estimated and actual costs must be published if the cost of compliance has exceeded

$500 at the end of the first full fiscal year of implementation. § 536.200.2.

14. Section 536.200.2 serves as a limited safeguard in this respect. When it enacted that statute, the General Assembly undoubtedly recognized that an agency might not be able to predict future compliance costs with a great deal of precision. If the actual costs for the first full fiscal year after implementation of a rule are 10% or more higher than predicted, affected entities are at least given some notice that the aggregate cost estimate may be on the low side. This enables them to better plan for the future and could induce further discussion and debate about the rule and whether it needs to be amended or repealed.

The object of the fiscal note requirement is assurance that state agencies and, in turn, the legislature and the public are aware of the economic costs as well as the benefits of rulemaking actions. To achieve this, fiscal notes are required when the effect of rulemaking includes a material economic impact on public and private expenditures, public revenues and private incomes.

20 Alfred S. Neely & Daniel W. Shinn, *Missouri Practice: Administrative Practice and Procedure* § 6.51 (1986). These requirements are not trivial. They are necessary to ensure that any agency proposing a rule adequately considers the private and public entities it will affect. At the very least, the fiscal note "force[s] the agency to think about the economic consequences of its rulemaking." *Id.* Fiscal notes also serve another important purpose: to give potentially affected entities notice of the estimated financial impact a given rule might have on them. In fact, § 536.205.1(2) explicitly requires that private entities be classified "in such manner as to give reasonable notice of the number and kind of businesses which would likely be affected" by a given rule. Indeed, as our Supreme Court recently noted while discussing the general notice and comment procedures contained in § 536.021, RSMo Supp. 1992:

> The very purpose of the notice procedure for a proposed rule is to allow opportunity for comment by supporters or opponents of the measure, and so to induce a modification.[15] ... To neglect the notice ... or to give effect to a *proposed* rule before the time for comment has run ... undermines the integrity of the procedure.

**15.** *See* § 536.215, RSMo 1986, which provides that if a proposed rule is modified before its effective date "to the extent that the [previously estimated compliance] cost or reduction in income is changed by more than ten percent," a new fiscal note and affidavit must be filed with the order of rulemaking and the new estimated cost must be published in the Missouri Register.

**16.** The first director of the Administrative Rules Division of the Office of the Secretary of State recently wrote that Missouri's "experience with fiscal notes has been varied. The majority of rules issued by agencies appear to not have major financial impact, although it is hard to imagine a five-page, highly technical rule having an impact of less than $500 statewide. Neverthe-

*NME Hospitals v. Department of Social Servs., Div. of Medical Servs.*, 850 S.W.2d 71, 74 (Mo. banc 1993) (quoting *St. Louis Christian Home v. Missouri Comm'n on Human Rights*, 634 S.W.2d 508, 515 (Mo.App.1982)) (emphasis in original, internal footnote added). If an entity potentially affected by a proposed rule sees a public notice of rulemaking reflecting no cost or minimal cost of compliance, that entity may choose not to participate in the rulemaking process. If, on the other hand, the entity anticipates substantial compliance costs, it will be far more inclined to get involved. With such participation, state agencies are more likely to adequately consider the economic impact of their rulemaking activities, better rules are adopted, and public support for such rules is generated.[16]

We now return to the trial court's decision invalidating Rules 160 and 190. The parties cited and our research uncovered no reported Missouri cases in which a rule has been invalidated due to the promulgating agency's failure to comply with the fiscal note requirements of §§ 536.200 and 536.205. *Cf. Missouri Hosp. Ass'n v. Missouri Dep't of Consumer Affairs, Regulation & Licensing*, 731 S.W.2d 262 (Mo.App.1987) (trial court found rules invalid because of failure to satisfy fiscal note requirements, but appellate court found it unnecessary to reach the issue). Rules have been declared invalid under § 536.021.6, which is similar as it provides that "any rule, or amendment or rescission thereof ... shall be void unless made in accordance with the provisions of this section." In *NME Hospitals*, the Court de-

less, the majority of published rulemakings indicate as much.... [T]here have been instances where an agency proposed a substantial change without adequately considering the impact on the public, apparently due to a lack of perception as to the magnitude of the change." Gary W. Duffy, *Administrative Rules and Rulemaking, in* 1 *Missouri Administrative Law* § 4.14 (2d ed. 1990). We have examined several recent issues of the Missouri Register, and it certainly appears that state agencies routinely decide that their rulemaking activities do not impose public or private costs high enough to trigger the fiscal note and disclosure provisions of §§ 536.200 and 536.205. We find this disconcerting.

clared that "[a] rule adopted in violation of § 536.021 is void." 850 S.W.2d at 74. It went on to say "[t]here is no dispute that the department failed to comply with rulemaking procedures in enacting the amendment that is the subject of the dispute in the present case. The amendment is void." *Id.*

Where statutory language is clear, unambiguous and admits of one meaning, there is no room for construction. *Strunk v. Hahn,* 797 S.W.2d 536, 546 (Mo. App.1990). Sections 536.200.3 and 536.205.2 mean exactly what they say: rules adopted in violation of their mandates are void and of no force or effect. *See also* A. Neely & D. Shinn, *supra,* § 6.51 ("The fiscal note, when applicable, is a condition which must be satisfied if the rulemaking is to result in a valid rule.") The numerous other defects discussed in this opinion aside, since the two-year compliance cost estimates furnished by the Commission for Rules 160 and 190 do not fulfill the statutory requirement that "[t]he estimated cost in the aggregate" to public entities be published in the Missouri Register contemporary with and adjacent to the notice of proposed rulemaking, the trial court correctly held that they were void under § 536.-200.3. Furthermore, because the fiscal note filed with Rule 160 relating to private entity costs did not comply with § 536.205.1(1)–(3) and the Commission erroneously determined that a fiscal note estimating the cost of compliance to private entities was not necessary for Rule 190, the trial court also correctly held that the two rules were "void and of no force and effect" under § 536.205.2, which requires that such fiscal notes be published in the Missouri Register contemporary with and adjacent to the notice of proposed rule-making.

II.

While our holding that Rules 160 and 190 are void due to the State's failure to comply with the provisions of §§ 536.200 and 536.205 is dispositive of this appeal, the State vigorously urges us to decide the second issue presented, i.e., whether § 643.055 is a limitation on the Commission's rulemaking authority. The State correctly points out that if this question is left open, the rules will again be promulgated, with corrected filing procedures and better fiscal information, but may nevertheless still be void if the trial court was correct in its ruling on the impact of § 643.055. Furthermore, leaving this point unresolved will result in delay, and additional litigation and expense for the parties. The issue has been fully briefed and argued by all parties. Because of its importance to the public, the State and the regulated community, we will also address the State's second point.

To resolve this issue, we must interpret the Missouri Air Conservation Law, Chapter 643, RSMo, in particular §§ 643.050.1 and 643.055.1.[17] Section 643.050.1 was originally enacted in 1965, amended in 1972, and amended once again in 1992.[18] Prior to the 1992 amendments, § 643.050.1, RSMo 1986, read as follows:

> In addition to any other powers vested in it by law the commission shall have the following powers: (1) Adopt, promulgate, amend and repeal rules and regulations consistent with the general intent and purposes of sections 643.020, 643.040 to 643.-100, 643.120, 643.140 to 643.170, 643.190 and 643.195 and in accordance with the provisions of section 643.070, including by [sic] not limited to: (a) Regulation of use of equipment known to be a source of air contamination; and (b) Establishment of maximum quantities of air contaminants that may be emitted from any air contaminant source;

After those amendments, § 643.050.1 read like this:

> In addition to any other powers vested in it by law the commission shall have the

---

17. When originally enacted in 1965, the Missouri Air Conservation Law was Chapter 203, RSMo. In RSMo 1986, it was renumbered as Chapter 643, though the sections retained the same last three digits. For simplicity and uniformity, the Chapter 643 numeration will be used throughout this opinion, even when referring to the pre-1986 statutes which were officially contained in Chapter 203.

18. Senate Bill No. 544, Laws of Mo.1992, p. 1181. The amendments became effective August 28, 1992.

following powers: (1) Adopt, promulgate, amend and repeal rules and regulations consistent with the general intent and purposes of sections 643.010 to 643.190 and Titles V and VI of the federal Clean Air Act, as amended, 42 U.S.C. 7661, et seq., including but not limited to: (a) Regulation of use of equipment known to be a source of air contamination; (b) Establishment of maximum quantities of air contaminants that may be emitted from any air contaminant source; and (c) Regulations necessary to enforce the provisions of Title VI of the Clean Air Act, as amended, 42 U.S.C. 7671, et seq., regarding any Class I or Class II substances as defined therein;

The 1992 version of § 643.050.1 differs from its earlier counterpart in that the Commission is granted authority to adopt rules and regulations "consistent with the general intent and purposes of sections 643.010 to 643.-190 and Titles V and VI of the federal Clean Air Act, as amended, 42 U.S.C. 7661, et seq....."

Section 643.055, RSMo 1986, titled "Commission may adopt rules for compliance with federal law—suspension, reinstatement," was first passed in 1979. As originally enacted, it provided:

1. Other provisions of law notwithstanding, the Missouri air conservation commission shall have the authority to promulgate rules and regulations, pursuant to chapter 536, RSMo, to establish standards and guidelines to insure that the state of Missouri is in compliance with the provisions of the federal "Clean Air Act." (42 USC Section 7401, et seq.). The standards and guidelines so established shall not be any stricter than those required under the provisions of the federal Clean Air Act; nor shall those standards and guidelines be enforced in any area of the state prior to the time required by the federal Clean Air Act.

2. The Missouri air conservation commission shall also have the authority to grant exceptions and variances from the guidelines and standards set under subsection 1 of this section when the person applying for the exception or variance can show that compliance with such standards and guide-

lines: (1) Would cause economic hardship; or (2) Is physically impossible; or (3) Is more detrimental to the environment than the variance would be; or (4) Is impractical or of insignificant value under the existing conditions.

3. Any rule or portion of a rule promulgated pursuant to this section may be suspended by the joint committee on administrative rules if after hearing thereon the committee finds that such rule or portion of the rule is beyond or contrary to the statutory authority of the commission, or is inconsistent with the legislative intent of this section. The general assembly may reinstate such rule by concurrent resolution signed by the governor.

In 1992, § 643.055 was amended in the same Senate Bill which had modified § 643.050. Laws of Mo.1992, p. 1183. Section 643.055.3 was deleted, the phrase "guidelines and standards" in § 643.055.2 was replaced by the word "rules," and everywhere the Clean Air Act was mentioned, the words "as amended" were added. Accordingly, § 643.055 currently reads:

1. Other provisions of law notwithstanding, the Missouri air conservation commission shall have the authority to promulgate rules and regulations, pursuant to chapter 536, RSMo, to establish standards and guidelines to ensure that the state of Missouri is in compliance with the provisions of the federal "Clean Air Act", as amended (42 U.S.C. Section 7401, et seq.). The standards and guidelines so established shall not be any stricter than those required under the provisions of the federal Clean Air Act, as amended; nor shall those standards and guidelines be enforced in any area of the state prior to the time required by the federal Clean Air Act, as amended.

2. The Missouri air conservation commission shall also have the authority to grant exceptions and variances from the rules set under subsection 1 of this section when the person applying for the exception or variance can show that compliance with such rules: (1) Would cause economic hardship; or (2) Is physically impossible; or (3) Is more detrimental to the environment than

the variance would be; or (4) Is impractical or of insignificant value under the existing conditions.

■■■ Where several statutes relate to the same subject matter, and are consistent with each other, they are considered *in pari materia* and are construed together as though constituting one act, whether adopted at different dates or separated by long or short intervals. *State ex rel. Rothermich v. Gallagher*, 816 S.W.2d 194, 200 (Mo. banc 1991). If, however, two statutes addressing the same subject matter conflict, the more specific statute is given precedence over the more general one. *State ex rel. Tate v. Turner*, 789 S.W.2d 240, 241 (Mo.App.1990). And, when a general statute conflicts with one which is subsequently enacted with more detailed treatment of the same subject matter, the specific one is regarded as a qualification of the general statute. *Evans v. State*, 779 S.W.2d 253, 254 (Mo.App.1989).

Keeping these principles in mind, in interpreting §§ 643.050 and 643.055, we first note that § 643.050 contains no limitation or qualification on the Commission's rulemaking authority, but rather is an enabling statute. In discussing its powers, which appear to be plenary, § 643.050.1(1) says they include but are not limited to those listed in §§ 643.050.-1(1)(a)–(c). In contrast, in § 643.055, which was passed subsequent to adoption of § 643.-050, the Commission's rulemaking powers are described in specific terms.

The State nevertheless argues that the first sentence in § 643.055.1 is an independent grant of authority to the Commission to promulgate rules to establish standards to ensure compliance with the federal Clean Air Act.[19] According to the State, the opening phrase "[o]ther provisions of law notwithstanding" indicates that the grant of authority overrides any provision of law which might conflict with the goal of compliance with the federal Clean Air Act. The State then reasons that the second sentence of § 643.055.1 places limitations on the Commission's exercise of the authority granted by the first sentence—in other words, that the limitation in the second sentence applies only to those rules necessary and specifically promulgated to ensure compliance with the federal act. The thrust of the State's argument is that § 643.055 must be read in isolation from § 643.050. However, both sections clearly deal with the Commission's rulemaking authority, and they must be considered *in pari materia.*

■■■ The 1972 version of § 643.050.1 in effect at the time § 643.055.1 became law made no mention of the federal Clean Air Act. It simply granted the Commission authority to make rules and regulations "consistent with the general intent and purposes" of various sections of Chapter 643, which is designated by § 643.010, RSMo 1986, as the "Missouri Air Conservation Law."[20] In 1979

---

**19.** The first attempt by Congress to regulate air pollution was the Air Pollution Control Research and Technical Assistance Act of 1955, Pub.L. No. 84–16, 69 Stat. 322. In 1963, Congress enacted the Clean Air Act, Pub.L. No. 88–206, 77 Stat. 392 (1963), and in 1967, the Air Quality Act. Pub.L. No. 90–148, 81 Stat. 485 (1967). The Clean Air Act has been amended on numerous occasions since 1963, most recently in 1990. Pub.L. No. 101–549, 104 Stat. 2399 (1990).

The federal Clean Air Act expressly reserves to the states the authority to pass laws more stringent, but not less, than the federal law except in specific situations where the federal law preempts state authority, all of which are inapplicable to this appeal. 42 U.S.C. § 7416 (1988). A primary feature of the Clean Air Act is the requirement that the United States Environmental Protection Agency (EPA) develop National Ambient Air Quality Standards (NAAQS) to limit permissible concentrations of air pollutants that pose a threat to public health and welfare. States are required to submit for EPA approval

plans to implement the attainment, maintenance and enforcement of the standards. Such a State *Implementation Plan* (SIP), once approved, becomes federally enforceable. An SIP may target within a state a designated "nonattainment area" for a particular air pollutant. The EPA is required to develop a Federal Implementation Plan (FIP) for a state which fails to submit an acceptable SIP, and a delinquent state risks such sanctions as a ban on construction of new facilities and the loss of federal highway and transportation funds. States are given wide latitude to develop the details of their implementation plans, which may include controls upon sources of air pollution through statutes, regulations, permit programs, consent agreements and so on, provided that the attainment goals of the Clean Air Act are reached.

**20.** As originally adopted in 1965, § 643.050 provided that the Commission could adopt rules and regulations "consistent with the general intent and purposes *of this chapter."* In 1972, this

(the year the General Assembly first passed § 643.055.1), there was nothing in the Missouri Air Conservation Law requiring compliance with the federal Clean Air Act, nothing mandating that Missouri rules and regulations on subjects governed by the federal Clean Air Act be no more strict than those imposed by federal law, and nothing saying that such rules and regulations could be enforced no sooner than federal law provided. Therefore when § 643.055.1 became law in 1979, it placed a limitation on the Commission's general rulemaking authority under § 643.050.1 to adopt rules and regulations "consistent with the general intent and purposes" of the various sections of Chapter 643 listed therein. The initial phrase in § 643.-055.1, "[o]ther provisions of law notwithstanding," is clearly referring to the Commission's general rulemaking authority under § 643.050.1. While some of the language used in the first sentence of § 643.055.1 appears to support the State's contention that it is an additional, independent grant of rulemaking authority to the Commission, when it is read *in pari materia* with § 643.050 (rather than in isolation), it becomes clear that the State's position is untenable.

As noted previously, § 643.050.1 contains virtually no limitation or qualification on the Commission's rulemaking authority. Sections 643.050.1(a) and (b) specifically permit regulation of the use of any equipment known to be a source of air contamination and authorizes establishment of maximum emission levels for air contaminants from any source. In short, § 643.050.1 provides all the rulemaking authority the Commission needs to "insure that the state of Missouri is in

compliance with the provisions of the federal 'Clean Air Act.'" § 643.055.1.[21]

 In interpreting a statute, we will not presume the legislature enacted a redundant provision. *State v. Carouthers,* 714 S.W.2d 867, 870 (Mo.App.1986). It is therefore clear that the true intention of the General Assembly in adopting § 643.055 was to direct the Commission to make sure that Missouri was in compliance with the federal Clean Air Act, *not* to grant the Commission rulemaking authority it already possessed.

This conclusion is bolstered by a review of the 1977 amendments to the Clean Air Act. They covered a wide range of subjects, but several specifically related to compelling states to comply with the Act. In particular, the 1977 amendments added § 176(a), which placed restrictions on federal transportation funding as a sanction to be threatened when local or State officials failed to submit an acceptable State Implementation Plan (SIP). S.Rep. No. 228, 101st Cong., 2d Sess. 26 (1989), *reprinted in* 1990 U.S.C.C.A.N. 3385, 3412. This section provided, among other things, that the Secretary of Transportation could not approve any projects or grants "other than for safety, mass transit, or transportation improvement projects related to air quality improvement or maintenance," in an air quality control region where the

> Administrator [of the EPA] finds after July 1, 1979, that the Governor has not submitted an implementation plan which considers each of the elements required by section 7502 of this title or that reasonable efforts toward submitting such an implementation plan are not being made (or, after July 1, 1982, in the case of an imple-

---

language was changed to "consistent with the general intent and purposes of sections 643.020, 643.040 to 643.100, 643.120, 643.140 to 643.170, 643.190 and 643.195." The deletion of the phrase "of this chapter" and substitution of the specific sections of the chapter was appropriate because of the 1967 passage of § 643.600, RSMo 1986, the Kansas–Missouri Air Quality Compact. The Compact creates a Kansas–Missouri Air Quality Commission in Article IV, and in Article V grants that commission power to adopt rules consistent with the Compact. Since the Compact was part of Chapter 643, the legislature was making it clear that the rulemaking authority of the Air Conservation Commission of Missouri did not extend to the Compact.

21. By virtue of § 536.021.2(2), the notice of proposed rulemaking for each rule in the Missouri Code of State Regulations must cite the statutory authority pursuant to which the rule is being promulgated. The Associations argue (and it was undenied by the State) that in the voluminous body of air regulations currently in effect, there is not a single such reference to § 643.055. Furthermore, § 643.050 is specified as the legal authority under which both Rule 160 and Rule 190 were proposed. 10 CSR 10.6–160 (March 30, 1992) at 43; 10 CSR 10.6–190 (March 30, 1992) at 45.

mentation plan revision required under section 7502 of this title to be submitted before July 1, 1982).

42 U.S.C. § 7506(a)(3) (1988), *repealed by* Clean Air Act Amendments of 1990, Pub.L. No. 101–549, § 110(4), 104 Stat. 2399, 2470. Thus, with this amendment, the states were for the first time subject to loss of federal highway funds if they failed to submit an acceptable SIP. Therefore, there was now a potential sanction to Missouri if it failed to comply with the federal Act, and it became far more important to insure compliance with the Act. The legislature responded by passing § 643.055 in 1979.[22]

The limitation on the Commission's rulemaking authority is contained in the second sentence of § 643.055.1, which provides, in essence, that in ensuring compliance with the federal Act, Missouri is to make no rule stricter than required by federal law, nor shall it enforce a rule earlier than required by federal law. The state argues, in conjunction with its contention that § 643.055 must be read as an additional grant of authority, that the limitation of the second sentence only applies to rules made pursuant to the expanded power to make rules. Since we conclude § 643.055 is not an additional grant of authority, this argument is moot. However, we must still address the impact of our conclusion on Rules 160 and 190.

▆ The federal Clean Air Act does not preempt state authority except in a limited number of situations where specific provisions expressly do so. 42 U.S.C. § 7416

(1988). Congress elected not to preempt in the area of waste incinerators. 42 U.S.C.A. § 7429(h). Therefore *under federal law*, Missouri remains free to regulate incinerators so long as those regulations are at least as stringent as any federal counterpart. The question, then, is whether Rules 160 and 190 were authorized *under Missouri law*.[23]

▆ As noted earlier, the limitation on the Commission's rulemaking authority is contained in the second sentence of § 643.-055.1. The first sentence of the section requires the Commission to adopt standards and guidelines to ensure that Missouri is complying with the federal Clean Air Act. The second sentence says, in effect, that such standards and guidelines cannot be any stricter or be enforced sooner than those required by federal law. The meaning and effect of this provision can only be that the General Assembly has chosen to allow federal law to preempt the Commission's rulemaking authority as to areas covered by the Clean Air Act. In other words, if Congress has spoken on a particular issue in the federal Clean Air Act, the Commission is prohibited from adopting rules or regulations on that issue that are either stricter than federal law or enforceable sooner. Thus, in the case of incinerators, which are the subject of the challenged rules in this case, Congress has directed EPA to adopt rules establishing standards for such units, and further specified dates as to when there must be compliance with such rules. EPA has yet to promulgate those rules.[24] Therefore, any rule

**22.** Missouri's response to the Clean Air Act and amendments thereto has always been in the second year following the federal action. The federal Act was adopted in 1963. The Missouri Air Conservation Law was enacted in 1965. The first major amendment of the federal Clean Air Act was in 1970, which was followed in Missouri by significant revisions to the Missouri Air Conservation Law in 1972. As noted in the text, the 1977 federal changes were followed in 1979 with adoption of § 643.055. The vast revision of the Clean Air Act by Congress in 1990 resulted in passage of Missouri Senate Bill 544 in 1992.

**23.** Before November 15, 1990 (the date the Clean Air Act Amendments of 1990 became law), the federal Clean Air Act did not include provisions specifically regulating waste incinerators. Section 129 of the 1990 amendments required the

EPA to promulgate standards for certain classes and sizes of "solid waste incineration units" by specific deadlines. 42 U.S.C.A. § 7429(a)(1)(A). Standards for units with a capacity greater than 250 tons per day combusting "municipal waste" were to be promulgated by November 15, 1991, 42 U.S.C.A. § 7429(a)(1)(B), and the EPA did in fact establish new source performance standards for such units effective August 21, 1991. In addition, since 1974 EPA has had a standard limiting emissions of particulate matter for incinerators with a capacity of 50 tons or more per day. One of the rules challenged in this appeal, Rule 160, applies to the incinerators just described, and the State admits that Rule 160 is in part stricter than the federal standards.

**24.** The 1990 amendments to the Clean Air Act directed the EPA to establish federal standards

adopted by the Commission at this time will be stricter than federal requirements because no federal standards currently exist. Furthermore, the compliance dates established by the Commission in Rules 160 and 190 are, in some cases, earlier than those required by Congress to be used by EPA in its rules and, therefore, would require compliance sooner than mandated by federal law, in violation of the second limitation in § 643.-055.1. Administrative agencies are creatures of statute and, as such, have only such jurisdiction and authority as is delegated to them by the legislature. *Jenkins v. Director of Revenue,* 858 S.W.2d 257, 260 (Mo.App.1993). An agency may promulgate rules and regulations only to the extent of and within the authority delegated to it by the legislature. *Brown v. Melahn,* 824 S.W.2d 930, 933 (Mo. App.1992). Because the Commission exceeded the rulemaking authority given it by the General Assembly when it promulgated Rules 160 and 190, they are void. *Missouri Hosp. Ass'n v. Missouri Dep't of Consumer Affairs, Regulation & Licensing,* 731 S.W.2d 262, 264 (Mo.App.1987).

■ The State contends that this interpretation will render all the Commission's rules which are not duplicative of federal standards a nullity. This is incorrect. The Commission continues to have rulemaking authority to regulate Missouri air quality in all ways, and in all areas, not covered by the federal Clean Air Act. While the General Assembly decided to limit the Commission's authority by permitting federal law to preempt on subjects where Congress has spoken, *it did not so limit its own authority.* It retains the ability and legal right to regu-

late air quality in the state, *including the ability to repeal or amend § 643.055.* The legislature amended § 643.055 in 1992, while this action was pending, but it chose not to repeal the section.

■ When interpreting statutes, the court must view a statutory provision in light of the entire legislative act, harmonizing all provisions if possible, *Lindsay v. Hopkins,* 788 S.W.2d 776, 779 (Mo.App.1990), and must construe the statute in light of the purposes the legislature intended to accomplish and the evils it intended to cure. *Gannett Outdoor Co. v. Missouri Highway & Transp. Comm'n,* 710 S.W.2d 504, 506 (Mo.App.1986). In enacting § 643.055, the General Assembly clearly recognized the burden imposed on the regulated community in attempting to comply with three separate levels of laws and regulations (federal, state and local), as well as the extreme difficulty of trying to comply with multiple bodies of regulations in given areas. It further understood that where there are two or more sets of standards and guidelines with which those affected by regulations must comply, the enormous compliance costs could devastate Missouri's economy and lead to job losses for its citizens. The General Assembly therefore concluded that it was essential to the well being of the state's economy and its workers that Missouri follow federal law and regulations (where they exist) in the area of air quality, for the dual purposes of assuring industry and the regulated community that they would only need to meet the requirements of a single regulatory scheme, as well as assuring the public that air quality would be protected by compliance with the federal Clean Air Act.

by November 15, 1992 for incinerators burning hospital, medical, or infectious waste and municipal waste incinerators with a capacity less than or equal to 250 tons per day. 42 U.S.C.A. § 7429(a)(1)(C). The EPA failed to meet that deadline and has yet to promulgate rules for such incinerating units. Indeed, EPA has not even announced rule proposal and promulgation dates for large and small municipal waste incinerators (Municipal Waste Combustion, 58 Fed.Reg. 25,-060 (1993)), and now projects rule proposal for infectious, hospital and medical waste incinerators in March, 1994 with final action in August, 1995 (Medical Waste Incinerators, 58 Fed.Reg. 25,059 (1993)). The 1990 amendments did not require standards to be proposed for units com-

busting "commercial or industrial waste" until November 15, 1993, with promulgation called for by November 15, 1994. 42 U.S.C.A. § 7429(a)(1)(D).

With respect to all the aforementioned incineration units governed by the 1990 Clean Air Act and Clean Air Act amendments, effective dates for federal standards shall apply to new units six months after the date of promulgation; whereas, for existing units the effective dates for implementing the standards shall be established by a state plan approved by EPA, but not later than the earlier of three years following EPA's approval of the plan or five years following promulgation of the standards. 42 U.S.C.A. §§ 7429(f)(1)–(2).

The State also argues that this interpretation will mean that the Commission is relegated to the role of merely implementing programs devised by EPA. For the same reasons described above, this is incorrect. It is only in areas *where Congress has acted* that the Commission will be implementing EPA programs; in all other areas of air quality, the Commission will still act independently. In addition, any such "relegation" was done by the legislative body which created the Commission, granted it what rulemaking powers it has, and at whose pleasure it continues to exist.

Acknowledging the potential for our holding that § 643.055.1 is a limitation on the Commission's rulemaking authority, the State next argues that Rules 160 and 190 are not void because they were promulgated after the effective date of the 1990 amendments to the Clean Air Act but prior to adoption of Missouri Senate Bill 544 in 1992. The thrust of the State's argument is that § 643.055.1 as originally passed in 1979 governs with respect to the two rules; that it referred only to the "federal Clean Air Act," and not the "federal Clean Air Act as amended;" that the Clean Air Act in 1979 had no provisions addressing incinerators; and therefore, the Commission was not prohibited from adopting regulations relating to incinerators because federal law as it existed in 1979 had not spoken on the subject.

We reject this contention. First, § 643.055 did not "adopt" the federal Clean Air Act into Missouri law. Reference to a federal act in a Missouri statute does not necessarily incorporate it into Missouri law. *Brown v. State,* 323 Mo. 138, 145, 19 S.W.2d 12, 16 (Mo. banc 1929). Furthermore, neither the wording of § 643.055.1 nor the legislative intent even remotely suggest that the Clean Air Act was adopted or incorporated by reference into Missouri law. Rather, they

merely reflect an intention that Missouri be in compliance with that Act. Second, it is implicit in the mandate to keep Missouri in compliance with the federal Act that the General Assembly intended that Missouri comply with that Act not just at the time of passage of § 643.055, but at all times. The State takes the position that since the words "federal Clean Air Act" were not followed by "as amended" in the 1979 version of § 643.-055.1, it merely relates to the Clean Air Act as it existed on the day § 643.055.1 became law. This argument overlooks the fact that the federal Clean Air Act has existed since 1963, and though amended on numerous occasions, it remains the federal Clean Air Act.[25] In other words, the statutory reference means the Clean Air Act as it exists on any given date. This conclusion is buttressed by the fact that the General Assembly changed § 643.055 in 1992 to add the words "as amended" after each reference to the "federal Clean Air Act." This amendment was simply a reiteration and clarification of the existing law. Statutory amendments may be used to clarify or restate legislative intent, *State ex rel. McCulloch v. Schiff,* 852 S.W.2d 392, 395 (Mo.App.1993), and subsequent statutes may be considered in construing previously enacted statutes, *State v. Thomas,* 351 Mo. 804, 810, 174 S.W.2d 337, 340 (Mo. banc 1943), in order to ascertain the uniform and consistent purpose of the legislature.

For both of the reasons described above, the trial court correctly held that Rules 160 and 190 were void and of no force or effect. The judgment is therefore affirmed.

All concur.

---

**25.** The Clean Air Act was amended, in some respect, in 1966 (Pub.L. No. 89–675, 80 Stat. 954 (1966)); 1969 (Pub.L. No. 91–137, 83 Stat. 283 (1969)); 1970 (Pub.L. No. 91–604, 84 Stat. 1676 (1970)); 1971 (Pub.L. No. 92–157, 85 Stat. 464 (1971)); 1973 (Pub.L. No. 93–15, 87 Stat. 11 (1973)); 1974 (Pub.L. No. 93–319, 88 Stat. 246 (1974)); and 1977 (Pub.L. No. 95–95, 91 Stat. 689 (1977)); all before passage of § 643.055 in 1979. In its argument, the State misses the mark in contending that because "as amended"

doesn't follow the reference to the Act in the original version of § 643.055, the latter statute applies only to the Clean Air Act as it existed in 1979. If we were to accept the State's position, however, we would either have to conclude that § 643.055 applies only to the Clean Air Act as originally passed in 1963, or construe it to read "Clean Air Act as amended prior to 1979." We decline the invitation to accept either of these conclusions.