**BLUE CROSS AND BLUE SHIELD OF KANSAS CITY, INC., A Missouri Nonprofit Corporation, et al., Appellants,**

v.

**Jeremiah W. (Jay) NIXON, et al., Respondents.**

**No. WD 56493.**

Missouri Court of Appeals, Western District, En Banc.

June 20, 2000.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 1, 2000.

Application for Transfer Denied Oct. 3, 2000.

Paul G. Schepers, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., John R. Munich, J. Robert Sears, Jefferson City, for respondent.

Before BRECKENRIDGE, Chief Judge, ULRICH, SPINDEN, SMART, ELLIS, LAURA DENVIR STITH, EDWIN H. SMITH, HOWARD, NEWTON, HOLLIGER, Judges, and MARTIN, Special Judge.

JOSEPH M. ELLIS, Judge.

Blue Cross Blue Shield of Kansas City (BCBSKC), Grace E. Jackson, and Science of Business, Inc. appeal from the trial court's grant of partial summary judgment in favor of the Attorney General on their petition for declaratory judgment. Appellants brought the declaratory judgment action in the Circuit Court of Cole County for a determination of BCBSKC's status

under the Missouri Nonprofit Corporations Act.[1]

BCBSKC is a nonprofit Missouri corporation, formed in 1982 by the consolidation of Blue Cross of Kansas City and Blue Shield of Kansas City. Blue Cross of Kansas City was originally established in 1938 as Group Hospital Services, Inc (GHSI). The organization was comprised of Kansas City area hospitals and physicians as a nonprofit benevolent corporation, organized in response to what it saw as a need of Kansas City area residents to insure against catastrophic hospitalization expenses. Its stated primary purpose was to operate a pre-paid health care benefits plan under which participants who paid an enrollment fee and monthly dues received hospital services at minimal or no additional charge,[2] thereby providing a system through which a large group of individuals would pool money to pay for hospital care as needed by its members. Benefits were available only to subscribers who had paid the requisite enrollment and monthly fees. Appellant Grace E. Jackson is the first individual to be covered by the pre-paid health plan offered by GHSI.[3]

Another stated purpose of GHSI was to shore up failing nonprofit charitable hospitals in the Kansas City area. Prior to the time of GHSI's incorporation, such hospitals were in financial crisis due to a decrease in charitable donations. They faced the inability to fund the cost of the hospital services they provided from revenues collected from charitable donations as well as patient fees. At that time, approximately 30% of Kansas City area citizens requiring hospitalization declined such services because of an inability to pay. GHSI's stated intent upon incorporation was to increase the ability of these charitable hospitals to remain open by providing the means for more members of the community to have the ability to pay for hospital services. GHSI changed its name in 1970 to Blue Cross of Kansas City.

At the time of GHSI's incorporation, Section 101(8) of the Federal Revenue Act of 1938 (the predecessor to § 501(c)(4) of the Internal Revenue Code) provided that "civic leagues," "local associations or employees" and not-for-profit organizations "operated exclusively for the promotion of social welfare" could apply for and receive exemption from income tax. GHSI applied for and received tax exempt status under § 101(8) of the Revenue Act. GHSI also applied for social security tax exemption which was denied by the IRS because GHSI was "not organized and operated exclusively for one or more of the purposes specified in §§ 811(b)(8) and 907(c)(7) of the Social Security Act" (it was not a 501(c)(3) corporation).

Blue Shield of Kansas City originated in 1942 as Surgical Care, Inc. of Kansas City (SCI). The purpose of SCI mirrored that of GHSI except that it provided for pre-paid physician services as opposed to hospitalization services. Recognizing that many area residents did not seek out physicians' services due to an inability to pay, it provided a means by which members could pay small, affordable fees and receive physicians' services as needed at little or no charge. The benefits were only available to subscribers. Fees were originally based upon the subscriber's income, a practice which was subsequently discontinued in favor of flat rate fees. In 1971, SCI changed its name to Blue Shield of Kansas City. Both GHSI and SCI were the first of such plans in the Kansas City area.

In 1982, Blue Cross of Kansas City and Blue Shield of Kansas City merged to

---

1. Chapter 355, RSMo (1994). All subsequent statutory references are to RSMo 1994 unless otherwise indicated.

2. Each member was required to pay a $1.00 enrollment fee, a $.75 monthly fee, plus an additional fee of $.50 per month for the first dependent and $.25 per month for each additional dependent.

3. BCBSKC conceded in oral argument that inclusion of the other two plaintiffs in this action was "symbolic."

form Blue Cross Blue Shield of Kansas City (BCBSKC). As a result of the merger, BCBSKC succeeded to all the assets, rights, title, interest, liabilities, duties and obligations of its predecessors. BCBSKC operated the same type of pre-paid health benefits coverage as its predecessors, had the same purpose and character and its assets were impressed with the same obligations as its predecessors. It continued to derive its assets primarily from dues paid by or on behalf of participants in its plans and continued the practice of providing benefits only to those subscribers who paid the required fees to participate.

Prior to 1986, BCBSKC and its predecessors were classified as § 501(c)(4) organizations operated for the promotion of social welfare under the Internal Revenue Code. BCBSKC concedes that it originally qualified for exempt status because it was deemed to promote social welfare, and Congress and the IRS deemed exemption necessary to encourage such plans. The development of competing commercial for-profit insurance plans which survived without tax exemption prompted the IRS to recommend to Congress that there was no longer a need to grant exempt status to Blue Cross organizations in order to insure their survival. The IRS did not withdraw BCBSKC's exemption, but rather Congress, in enacting the Tax Reform Act of 1986, repealed their *entitlement* to exemption. *See, e.g.*, Schlesinger, et al., CHARITY AND COMMUNITY: THE ROLE OF NONPROFIT OWNERSHIP IN A MANAGED HEALTH CARE SYSTEM, 21 J. Health Pol. Pol'y & L. 697, 703–04 (1996).

Neither BCBSKC nor any of its predecessors have ever received a charitable contribution which was deductible to the contributors under § 501(c)(3) of the Internal Revenue Code, nor have any of the organizations ever sold stock or other forms of equity in the corporations.

BCBSKC contends that no dividends or return on investment have ever been distributed to any persons by any of the organizations.[4] From 1987 to 1996, BCBSKC and its controlled subsidiaries made charitable contributions averaging .055% of gross revenues per year. Since 1982, it provided free health checkups and participated in a National Blue Cross program entitled "The Caring Program," which offers health care at discounted rates for children of parents earning less than 150% of the poverty level. Participants are required to pay a monthly $25.00 premium to The Missouri Valley Caring Program for Children, Inc., a nonprofit 501(c)(3) corporation.

In 1994, the Missouri General Assembly adopted House Bill No. 1095, which extensively amended and revised Chapter 355 relating to nonprofit corporations. The chapter is now known as the "Missouri Nonprofit Corporation Act," *§ 355.001*, and covers §§ 355.001 through 355.881. It became effective on July 1, 1995. The new law distinguishes between "mutual benefit" corporations and "public benefit" corporations and requires that all nonprofit corporations in the state be classified under one of the two designations. *§ 355.881*. The Act further provides that each domestic corporation existing on July 1, 1995 shall be designated a "public benefit" or "mutual benefit" corporation. *Id.* The Act does not directly define the terms "mutual benefit corporation" or "public benefit corporation." Rather, it prescribes that a "mutual benefit corporation" is "a domestic corporation which is formed as a mutual benefit corporation pursuant to sections 355.096 to 355.121 or is required to be a mutual benefit corporation pursuant to section 355.881." *§ 355.066(23)* RSMo Cum.Supp. (1999). A "public benefit corporation," on the other hand, is "a domestic corporation which is formed as a public benefit corporation pursuant to sections 355.096 to

---

**4.** In a publicity release at the time of its inception, a GHSI official was quoted as saying, "If there are any profits they belong to the subscribers and with reasonable reserves set up for unfavorable periods other profits will be prevented from accumulating by increasing the benefits."

355.121,[5] or is required to be a public benefit corporation pursuant to section 355.881." § 355.066(28) RSMo Cum.Supp. (1999).

On March 1, 1997, BCBSKC filed a petition for declaratory judgment in the Circuit Court of Cole County, requesting a declaration of the court that it is a mutual benefit corporation pursuant to § 355.881.[6] In addition, BCBSKC sought a judgment that its assets are not held in a constructive or charitable trust for anyone other than the subscribers of its health plans. The petition named Attorney General Jay Nixon and Secretary of State Rebecca McDowell Cook as defendants. The Attorney General entered an appearance and assumed representation of both state officials. The Attorney General counterclaimed, seeking a declaration that BCBSKC was a public benefit corporation as defined by the Act, an injunction prohibiting BCBSKC from engaging in actions inconsistent with a public benefit corporation, or in the alternative, dissolution of BCBSKC. BCBSKC and the Attorney General each filed motions for summary judgment. A hearing was held on August 7, 1998 on stipulated facts. On September 11, 1998, the trial court denied BCBSKC's motion for summary judgment and granted partial summary judgment in favor of the Attorney General, declaring BCBSKC to be a public benefit corporation and granting the injunction. BCBSKC brings this appeal. On appeal, Consumers Union of U.S., Inc., Community Catalyst, Inc., Reform Organization of Welfare, and the Missouri Association for Social Welfare filed a motion for leave to appear as *amicus curiae* in support of the Attorney General's position. The motion was granted and an *amicus* brief has been filed.

5. Sections 355.096 to 355.121 address articles of incorporation, corporate existence, liability for preincorporation actions, organizational meetings, and emergency bylaws and powers applicable to all corporations.

6. This court has previously declined to decide whether a Blue Cross/Blue Shield plan is a

## JUSTICIABILITY AND MOOTNESS

This appeal was initially heard in division. After submission, but prior to opinion, the court, *sua sponte,* ordered rehearing en banc. During oral argument to the court en banc, questions arose as to whether the case presented a justiciable controversy and, even if it once did, whether the issue is now moot. The parties were granted time to file supplemental letter briefs on these questions subsequent to oral argument. While BCBSKC and the Attorney General both assert there is a justiciable controversy that is not moot, both are threshold issues for our determination. *State ex rel. Chastain v. City of Kansas City,* 968 S.W.2d 232, 237 (Mo. App. W.D.1998).

A justiciable controversy must exist to support a declaratory judgment action. *Akin v. Director of Revenue,* 934 S.W.2d 295, 298 (Mo. banc 1996). "A justiciable controversy exists where the plaintiff has a legally protectable interest at stake, a substantial controversy exists between parties with genuinely adverse interests, and that controversy is ripe for judicial determination." *Missouri Health Care Ass'n v. Attorney General of the State of Missouri,* 953 S.W.2d 617, 620 (Mo. banc 1997).

In the petition, BCBSKC alleged that it considered itself a mutual benefit corporation and intended to merge with Blue Cross and Blue Shield of Kansas. It further alleged that it had formally informed the Attorney General of its position and intention and that the Attorney General took "the position that BCBSKC is a Public benefit corporation, subject to all laws applicable to Missouri Public benefit corporations, including but not limited to the laws governing mergers of Not–for–Profit

mutual benefit corporation. *Blue Cross and Blue Shield of Missouri v. Angoff,* No. 53798, slip op. at n. 5, 1998 WL 435697 (Mo.App. W.D. Aug.4, 1998) (*appeal docketed,* No. 81172 (Mo.1999)).

corporations under Chapter 355...." The petition further generally alleged that:

1.) The Attorney General also took the position that BCBSKC's assets were impressed with a constructive and/or charitable trust and could not be distributed on dissolution to the subscribers of its health benefit plans, and that, as a Public Benefit corporation, BCBSKC is not authorized to merge with Blue Cross and Blue Shield of Kansas, and in the event of an unauthorized merger, it would be placed in receivership and its assets transferred to the public domain.

2.) BCBSKC could not undertake the costly and time-consuming plan for merger if it could lead to enforcement action by the Attorney General because BCBSKC's management and its board of directors were under a fiduciary duty not to waste corporate assets.

3.) The Secretary of State had accepted for filing and issued a Certificate of Amendment of BCBSKC's Articles of Incorporation declaring BCBSKC a Mutual Benefit corporation, thereby taking a position inconsistent with that of the Attorney General.

4.) A controversy exists between the parties as to the construction of Chapter 355 and its application to BCBSKC, as to the existence of a constructive and/or charitable trust impressed upon its assets, and as to the persons or entities entitled to receive the assets in the event of dissolution.

5.) The controversy affects the way BCBSKC conducts its operations and until it is resolved, BCBSKC and its Board are unable to determine whether contemplated acts and transactions, including proposed mergers, are in accordance with Missouri law and applicable fiduciary duties.

We now turn to whether the three elements of a justiciable controversy exist. First, BCBSKC must have a legally protectable interest. The petition generally alleged that the Attorney General's threats were affecting the conduct of its operations and impacting business decisions, in particular whether to proceed with proposed mergers. In *Missouri Health Care Ass'n*, the plaintiff alleged that a statute was unconstitutional and that it was adversely affecting the way its members' conduct business. 953 S.W.2d at 620. The Attorney General there argued that the plaintiff association and its members lacked standing because they did not have a legally protectable interest at issue. *Id.* The Court found the argument without merit, declaring that "[t]he interest in doing business free from the constraints of an unconstitutional law is entitled to legal protection." *Id.* The Court then went on to say that since the petition alleged that the statute is unconstitutional and that it is affecting the members' businesses, "the petition places a legally protectable interest at issue." *Id.*

We perceive no distinction between the factual circumstances in *Missouri Health Care Ass'n* and the instant appeal as to the existence of a legally protectable interest. While it only indirectly alleged that Chapter 355 is unconstitutional,[7] the petition here does assert that the Attorney General's construction of the applicable provisions of the statutory scheme, and the threats of enforcement action, adversely affect BCBSKC's ability to conduct its business and operations. A declaratory judgment action is an appropriate proceeding to determine controversies concerning the construction of statutes and powers and duties of governmental agencies thereunder. *State Tax Comm'n v. Administrative Hearing Comm'n*, 641 S.W.2d 69, 75 (Mo. banc 1982) *(quoting Regal–Tinneys*

---

**7.** BCBSKC's petition did allege that the Attorney General's threatened enforcement of Chapter 355 to impose a constructive or charitable trust on its assets would violate Mo. Const. Art. I, § 13 in that it would (a) impair the obligations of the contracts between BCBSKC and its policyholders and (b) cause the law to operate retrospectively in deprivation of all policyholder's substantive rights.

*Grove Special Road District of Ray County v. Fields,* 552 S.W.2d 719, 722 (Mo. banc 1977)). BCBSKC has as much interest in doing business free from the constraints of unauthorized enforcement action by the Attorney General as it does in being free from the constraints of an unconstitutional statute. Both are entitled to legal protection and constitute a legally protectable interest for purposes of a justiciable controversy.

■ We also find that a substantial controversy exists between BCBSKC and the Attorney General with genuinely adverse interests. BCBSKC contends that it is a Mutual Benefit corporation, while the Attorney General's answer and counter-claim assert that it is a Public Benefit corporation. The statutory scheme applicable to Public Benefit corporations is quite different from that applicable to Mutual Benefit corporations. Among the most notable is a provision that Public Benefit corporations may merge with Mutual Benefit or business corporations only if (a) the surviving corporation is a Public Benefit corporation, or (b) before the merger the fair market value of the Public Benefit corporation is conveyed to another Public Benefit corporation. *§ 355.621.1(4)(a).* There is no such restraint on Mutual Benefit corporations. Similarly, the statutes authorize the Attorney General to commence proceedings to dissolve Public Benefit corporations on the grounds that their assets are being misapplied or wasted or that they are no longer able to carry out their purposes. *§ 355.726.1(1)(c) & (d).* There are no similar provisions applicable to Mutual Benefit corporation. Thus, BCBSKC's petition alleged that it proposed to merge with Blue Cross and Blue Shield of Kansas and that the Attorney General threatened enforcement action pursuant to Chapter 355 if it did so because the Attorney General contended it was a Public Benefit corporation. This is a substantial controversy, and the parties' interests are genuinely adverse.

As noted in *Missouri Health Care Ass'n,* the Attorney General was empowered to enforce the challenged statute in that case, the association was challenging the constitutionality of the statute, and therefore the Attorney General was the proper party to defend it. 953 S.W.2d at 621. Accordingly, the petition alleged the requisite controversy between the association and the Attorney General. *Id.* In the instant appeal, the Attorney General is empowered to enforce provisions in Chapter 355 relating to dissolutions and mergers of Public Benefit corporations. He contends BCBSKC is a Public Benefit corporation subject to such enforcement, and he threatened enforcement thereof. BCBSKC, on the other hand, asserts it is a Mutual Benefit corporation and the Attorney General's threats impair its ability to conduct business. The similarities between *Missouri Health Care Ass'n* and the case *sub judice* are too great to suggest that a substantial controversy does not exist between BCBSKC and the Attorney General.

■ To be a justiciable controversy, however, it also must be ripe for judicial determination. *Id.* at 620. Once again, *Missouri Health Care Ass'n* is instructive.

> A ripe controversy is a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. A ripe controversy exists if the parties' dispute is developed sufficiently to allow the court to make an accurate determination of the facts, to resolve a conflict that is presently existing, and to grant specific relief of a conclusive character.

> In the context of a constitutional challenge to a statute, a ripe controversy generally exists when the state attempts to enforce the statute.

*Id.* at 621 (Citations omitted). As noted previously, a declaratory judgment action is an appropriate means of determining controversies involving the construction of statutes and powers and duties of governmental agencies thereunder. *Regal–Tin-*

*neys,* 552 S.W.2d at 722. And, from what has already been said, the dispute between BCBSKC and the Attorney General revolves around the construction of various provisions of Chapter 355. Furthermore, by virtue of the Attorney General's counter-claim seeking an injunction prohibiting BCBSKC from engaging in actions inconsistent with a Public Benefit corporation, the Attorney General is attempting to enforce his interpretation of the statute, not merely threatening enforcement. Accordingly, we find the case was ripe for judicial determination.

However, this conclusion does not end our inquiry. Mootness implicates the justiciability of a case. *Armstrong v. Elmore,* 990 S.W.2d 62, 64 (Mo.App. W.D. 1999). "In terms of justiciability, a case is moot if a judgment rendered has no practical effect upon an existent controversy." *Id.* " 'The existence of an actual and vital controversy susceptible of some relief is essential to appellate jurisdiction.' " *Id.* (quoting *State ex rel. Wilson v. Murray,* 955 S.W.2d 811, 812–13 (Mo.App. W.D. 1997)). When an intervenient event occurs which makes a court's decision unnecessary or granting effectual relief impossible, the case is moot and generally should be dismissed. *Chastain,* 968 S.W.2d at 237. Even a case vital at inception of the appeal may be mooted by subsequent occurrences which so alter the position of the parties that any judgment rendered would become merely a hypothetical opinion. *Gilroy–Sims and Assoc. v. City of St. Louis,* 697 S.W.2d 567, 569 (Mo.App. E.D.1985).

In oral argument and its supplemental letter brief, BCBSKC acknowledged that when the petition was filed it was actively pursuing a merger with Blue Cross and Blue Shield of Kansas. The parties stipulated that this merger could only be consummated if BCBSKC was a mutual benefit corporation. Accordingly, after the case was filed, the merger discussions were indefinitely tabled. However, the parties stipulated that BCBSKC fully intended "to expend time, money and corpo-

rate assets in exploring potential mergers with other mutual insurance companies." It is conceded by the parties that such expenditures are not permitted to be made by a Public Benefit corporation.

Thus, the question is whether the tabling of the merger talks with Blue Cross and Blue Shield of Kansas is an intervenient event which makes our "decision unnecessary or granting effectual relief impossible." *Chastain,* 968 S.W.2d at 237. We conclude that it does not because the dispute goes far beyond the tabled merger negotiations. While the merger talks with Blue Cross and Blue Shield of Kansas may have influenced BCBSKC to file the declaratory judgment action, the pleadings and stipulation of the parties reveal that a justiciable controversy continues to boil and is ripe for decision.

As noted previously, BCBSKC has a legally protectable interest in doing business free from the constraints of unauthorized enforcement action by the Attorney General. By filing his counter-claim seeking injunctive relief, the Attorney General is no longer threatening enforcement action against BCBSKC but is actively pursuing enforcement. The Attorney General sought an injunction not only prohibiting BCBSKC from engaging in actions inconsistent with a Public Benefit corporation, but also mandating that BCBSKC file amended articles of incorporation with the Secretary of State and adopt amended by-laws, both consistent with the status of a Public Benefit corporation. This action clearly affects how BCBSKC conducts its operations and business. Thus, BCBSKC has a legally protectable interest still at stake, and a substantial controversy still exists between it and the Attorney General. And, the controversy is ripe for judicial determination because the Attorney General is actively seeking to enforce the public benefit provisions of Chapter 355 against BCBSKC. Moreover, the dispute is sufficiently developed to allow this court to make an accurate determination of the facts and grant specific relief of a conclu-

sive character. *Missouri Health Care Ass'n,* 953 S.W.2d at 621.

Accordingly, we hold that BCBSKC's appeal is a justiciable controversy and is not moot.

## POINTS ON APPEAL

In its first point, BCBSKC argues that the trial court erroneously determined it to be a public benefit corporation under the test set forth in § 355.881(4) because it exists solely to benefit its insureds using funds derived from payments by those insureds, and therefore has no public or charitable purpose. In its second point, BCBSKC argues that the trial court's finding was in error because it is not obligated to donate any of its assets upon dissolution to the United States, a state, or a public benefit corporation. The Attorney General contends that BCBSKC has held itself out as having a public or charitable purpose and that its dissolution clause is consistent with a public benefit corporation. The issues raised on appeal are so intertwined that we will address them together.

## STANDARD OF REVIEW

Appellate review of the grant of summary judgment is *de novo. ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993). The record is reviewed in the light most favorable to the party against whom judgment was entered, according that party all reasonable inferences that may be drawn from the record. *Id.* We will uphold summary judgment on appeal if the movant is entitled to a judgment as a matter of law and no genuine issues of material fact exist. *Id.* at 377. Facts contained in affidavits or otherwise in support of a party's motion are accepted as true unless contradicted by the non-moving party's response to the summary judgment motion. *Id.* at 376. Once the movant has established the right to judgment as a matter of law, the non-movant must show that one or more of the material facts asserted by movant as not in dispute

is, in fact, genuinely disputed. *Reeves v. Keesler,* 921 S.W.2d 16, 19 (Mo.App. W.D. 1996). The non-moving party may not rely on mere denial of the pleadings, but must demonstrate by affidavits, admissions, depositions, or answers to interrogatories that a genuine issue of fact exists for trial. *Id.*

## ANALYSIS

Section 355.881 specifies the basis for designation of nonprofit corporations as either "mutual benefit" or "public benefit." It provides:

On July 1, 1995, each domestic corporation existing on that date that is or becomes subject to this chapter shall be designated as a public benefit or mutual benefit corporation as follows:

(1) Any corporation designated by statute as a public benefit corporation or a mutual benefit corporation is the type of corporation designated by statute;

(2) Any corporation which does not come within subdivision (1) of this section but is organized primarily or exclusively for religious purposes is a public benefit corporation;

(3) Any corporation which does not come within subdivision (1) or (2) of this section but which is recognized as exempt under section 501(c)(3) of the Internal Revenue Code, or any successor section, is a public benefit corporation;

(4) Any corporation which does not come within subdivision (1), (2) or (3) of this section, but which is organized for a public or charitable purpose and which upon dissolution must distribute its assets to a public benefit corporation, the United States, a state or a person which is recognized as exempt under section 501(c)(3) of the Internal Revenue Code, or any successor section, is a public benefit corporation; and

(5) Any corporation which does not come within subdivision (1), (2), (3) or (4) of this section is a mutual benefit corporation.

Since the first three criteria do not apply in this case, we concentrate our analysis on section 4 of the statute. Our analysis is two pronged: (1) whether BCBSKC is organized for a public or charitable purpose, and (2) whether its assets upon dissolution are required to be distributed to a public benefit corporation, the United States, or a state or person exempt under § 501(c)(3). We note that the inclusion of the conjunction "and" in the statute requires both of these criteria to be met in order for a corporation to qualify as a public benefit corporation under subsection (4). All others qualify as mutual benefit corporations under § 355.881(5). In determining the corporate purpose, we consider the context in which BCBSKC's articles of incorporation were adopted, the original purpose to be achieved by BCBSKC, and the evidence that establishes the construction BCBSKC originally placed on its articles of incorporation. *Twitty v. State Tax Comm'n of Missouri*, 896 S.W.2d 680, 687 (Mo.App. S.D.1995).

## A. PUBLIC PURPOSE

▮▮▮▮ The Nonprofit Corporations Act does not define the terms "public" and "charitable." The primary goal of statutory interpretation is to ascertain the intent of the legislature and give effect to that intent if possible. *State ex rel. Riordan v. Dierker*, 956 S.W.2d 258, 260 (Mo. banc 1997). In accomplishing this task, we must look to the language used, giving words their plain and ordinary meaning. *Id.* When a word used in a statute is not defined, the word's plain and ordinary meaning is derived from the dictionary. *Missouri Ethics Comm'n v. Wilson*, 957 S.W.2d 794, 799 (Mo.App. W.D.1997). When the intent of the statute cannot be determined from the plain and ordinary meaning of the words used and the statute is ambiguous, it should be given a reasonable reading and construed consistent with the legislature's purpose in enacting it. *Sullivan v. Carlisle*, 851 S.W.2d 510, 512 (Mo. banc 1993).

The term "public purpose" is not defined in the statute. The parties have not cited, and our independent research has not revealed, any cases defining the term. We did, however, find many cases discussing what is a "public purpose," generally in the constitutional context of whether public money is being expended for a "public purpose." *See Siegel v. City of Branson*, 952 S.W.2d 294, 297 (Mo.App. S.D.1997); *Cape Motor Lodge, Inc. v. City of Cape Girardeau*, 706 S.W.2d 208, 213 (Mo. banc 1986); *J.C. Nichols Co. v. City of Kansas City*, 639 S.W.2d 886, 890–91 (Mo.App. W.D.1982); *Menorah Medical Center v. Health and Educational Facilities Authority*, 584 S.W.2d 73, 79 (Mo. banc 1979). While these cases do not define "public purpose," they do instruct that "the term is 'elastic, and keeps pace with changing conditions,'" *J.C. Nichols Co.*, 639 S.W.2d at 891 (*quoting Bowman v. Kansas City*, 361 Mo. 14, 233 S.W.2d 26, 32 (Mo. banc 1950)), and that "[n]o hard and fast rules exist for determining whether specific uses and purposes are public or private." *Cape Motor Lodge, Inc.*, 706 S.W.2d at 213. "Thus, a definition of public purpose will likely vary with the character of the case in which the term is employed." *Siegel*, 952 S.W.2d at 297.

These concepts are consistent with the one definition of the term that we have found and adopt for purposes of ascertaining whether a corporation is organized for a public purpose as contemplated by § 355.881(4). "A public purpose or public business has for its objective the promotion of the public health, safety, morals, general welfare, security, prosperity, and contentment of all the inhabitants or residents within a given political division...." 1231 BLACK'S LAW DICTIONARY, 6th ed. (1990). BCBSKC argues that it does not have a public or charitable purpose since its benefits are provided only to a discrete group of subscribers. Conversely, the Attorney General maintains that BCBSKC and its predecessor corporations have held themselves out as promoting social welfare and being dedicated to public service.

BCBSKC cites a number of cases from foreign jurisdictions in support of its argument that we should look beyond the purposes for which it was formed to the current actions of the corporation in determining whether it has a public or charitable purpose. It points to *Illinois Hospital and Health Serv., Inc. v. Aurand,* 58 Ill.App.3d 79, 15 Ill.Dec. 549, 373 N.E.2d 1021 (1978), where the Illinois Supreme Court was called upon to determine whether a Blue Cross plan qualified for *property tax* exemption. In order to receive an exemption from property tax in Illinois, organizations must operate *exclusively* for a "charitable purpose." *Id.* at 1022 (emphasis added). Every corporation organized under Chapter 32 in Illinois was declared to have a charitable purpose by statute. *Id.* at 1022–23. In determining whether the entity in question "*operated* for a charitable purpose," the court looked beyond its originally-stated purpose, by which it obtained tax-exempt status, to its current operation to determine if the property in question was being *used* or *operated* for a charitable purpose. *Id.* at 1025–26. The court did not address whether the plan was a charitable organization, as it was already designated as charitable by statute. *Id.* at 1022. Ohio courts addressed the same or similar issues in *Hospital Service Ass'n of Toledo v. Evatt,* 144 Ohio St. 179, 57 N.E.2d 928 (1944) (property tax) and *Cleveland Hosp. Serv. Ass'n v. Ebright,* 45 N.E.2d 157 (Ohio Ct.App.1942) (franchise tax). In all of the cited authorities, the entities in question had already been designated as "charitable" by statute, and the issue before the courts was that of the corporation's tax status. *Illinois Hospital and Health Serv.,* 15 Ill.Dec. 549, 373 N.E.2d at 1022; *Hospital Serv. Ass'n of Toledo,* 57 N.E.2d at 930; *Cleveland Hosp. Serv. Ass'n,* 45 N.E.2d at 160. *Allison v. Mennonite Pub. Board,* 123 F.Supp. 23 (W.D.Pa.1954) involved a public charity which became involved in commercial business, which the court found

negated its charitable *immunity.* *Id.* at 29.

All of the cited cases are distinguishable from the instant appeal. In this case, the parties have stipulated to BCBSKC's tax status, and that it does not engage in for-profit activity. The enabling statutes do not designate BCBSKC as a charitable organization. Therefore, we confine our inquiry here to the standard set by the statute in issue and examine the purpose for which BCBSKC was originally organized. § 355.881(4).

■ In its order of September 11, 1998, the trial court made extensive findings to support its conclusion that BCBSKC was a public benefit corporation. The following are some of the more significant findings:

(1) GHSI was originally organized in response to a concern by charitable hospitals that area residents could not afford or budget for hospital care, and that nonprofit or charitable hospitals were in financial difficulty;

(2) GHSI's Articles of Incorporation indicated a public purpose;

(3) GHSI applied for and received tax exempt status under § 101(8);

(4) GHSI made public declarations that its corporate purpose was "to increase the ability of charitable hospitals to remain open, to decrease the likelihood that working members of the community would be forced into poverty and to decrease the resultant load on the community for caring for the sick, needy and poor;"

(5) Required representation on the Board of Directors of GHSI by three members of the general public (and none by "customers");

(6) SCI was organized to address similar concerns in the area of physician services;

(7) SCI received tax exempt status under 101(8);

(8) SCI had a stated purpose of providing surgical care protection, primarily

for low income earners, "guarantee[ing] that all medium and lower-income earners and their families receive full benefits for surgical care without cost other than the nominal monthly membership dues."

(9) The Bylaws of Blue Shield of Missouri state that a majority of the Board of Directors would be comprised of members of the general public.

(10) Following the 1982 merger, BCBSKC carried on the same types of pre-paid health benefit plans previously operated by GHSI, SCI, Blue Cross of Kansas City and Blue Shield of Kansas City.

(11) BCBSKC made numerous public assertions that it was "dedicated to the public service rather than profit" and that its plans "serve a major social purpose which government might otherwise have to serve."

A review of the record supports those findings. In its original Bylaws, GHSI announced the following purposes:

Article II Purposes. Section I. The purposes for which this corporation is formed are: to inaugurate, operate and maintain in the City of Kansas City and environs a hospital service plan by which hospitals subscribing to the plan will furnish hospitalization to individuals, also subscribers to the plan, when they may be in need of hospital care, such operation and maintenance of the plan to be without profit to the corporation or any member thereof; to collect in connection with the operation of the plan statistics and data and to compile reports *which may be deemed of value to the community, to the hospitals,* and to the furtherance of the plan; *to be of assistance in the promotion of such benevolent, educational, relief and other activities as are considered to be for the best interests of the community in relation to its hospitals* and to carry out all other purposes and objects of this corporation as set out in its Articles of Association (emphasis added).

Article III Membership. Section I. *The membership of this corporation shall consist of...a similar number which shall be representative of the interests of* the employers, employees, and *the general public,* to be selected by the Board of Trustees.

Article IV Board of Trustees. Section 1. *The governing body of the corporation shall be the Board of Trustees, which shall consist of nine members,* three of whom will represent the Jackson County Medical Society, three of whom will be hospital administrators, or trustees, and *three of whom shall represent the general public ...*

In its Amended Articles of Incorporation, dated February 11, 1956, GHSI articulated its purpose as, *inter alia:*

3. To do such other things consistent with its necessary activities as tend to provide for the relief of *persons residing within the territory it serves...*

4. To collect, verify, analyze and record, through the physicians and surgeons rendering services to its subscribers, case histories, statistics and other scientific and educational information and analyses *of value to the community and to physicians and surgeons generally.*

5. *To promote social welfare, health, the assembly of scientific information, medical, surgical and health research and for the purposes of benevolence and charity and of civic interest* (emphasis added).

In its Amended Articles of Incorporation in 1975 and 1978, Blue Cross of Kansas City stated:

Fourth: This Corporation is organized for the following purposes:

3. To do such other things consistent with its necessary activities as tend to provide for the relief of *persons residing within the territory it serves ...*

4. To collect, verify, analyze and record, through the physicians and sur-

geons rendering services to its subscribers, case histories, statistics and other scientific and educational information and analyses *of value to the community and to physicians and surgeons generally.*

5. *To concern itself with the health of persons living or coming within the territory in which it operates or may operate or to which it may extend any of its services and to conserve and to protect the health of the public.*

6. *To promote social welfare, health, the assembly of scientific information, medical, surgical and health research and for the purposes of benevolence and charity and of civic interest.*

At the time of its incorporation in 1942, SCI set out in its statement of corporate purpose:

3. To provide an agency and instrumentality whereby persons of limited income may be provided with such professional services by physicians and surgeons of their own choosing without expense other than small stipulated monthly contributions and thereby *to ease the demands upon public and private charity.*

4. To relieve from the minds of its contributors the fear and thought that, in case of necessity, they would be unable to select their own physician or surgeon, *but would be forced to rely upon public facilities or private charity.*

\* \* \*

9. *To be of assistance in the promotion of such benevolent, relief, educational and other activities as are considered to be for the best interests of the community in relation to the physicians and surgeons, Doctors of Medicine, and the people of the area.*

**231**

\* \* \*

SCI's Articles were amended in 1954 to include, as Articles 4, 5 and 6, those GHSI Articles 4, 5 and 6 set out above. The Articles of both Blue Cross of Kansas City and Blue Shield of Kansas City, filed at the time of the corporate name changes in 1970, do not vary from those set out above, except to add the following Articles:

3. To enter into formal or informal relationships with concerned individuals, corporations or other organizations *to enhance the quality and maintain an acceptable quantity of health care and to minimize its cost to all, whether paid for directly by the individual, or through the media of group prepayment, government grant, subsidy or otherwise.*

\* \* \*

6. To concern itself with the health of persons living or coming within the territory in which it operates or may operate *or to which it may extend any of its services and to conserve and to protect the health of the public.*

\* \* \*

Upon consolidation in 1982, BCBSKC's Articles of Incorporation echoed almost verbatim the foregoing provisions from Blue Cross of Kansas City and of Blue Shield of Kansas City. In addition, as noted previously, from their inception the various entities sought and received tax exempt status from the Internal Revenue Service pursuant to 26 U.S.C. § 501(c)(4). This section of the Code provides federal income tax exemption to nonprofit corporations which are operated exclusively for the promotion of social welfare.[8]

From the foregoing, it is readily apparent that throughout its various incarnations, BCBSKC has increasingly articulated, in addition to its purpose of operating a

8. As discussed, *supra,* BCBSKC and all other Blue Cross/Blue Shield organizations nationwide lost § 501(c)(4) tax status in 1987 as a result of enactment of the Tax Reform Act of 1986.

prepaid health service plan, a purpose to serve the general public in a benevolent and charitable capacity. It has more or less consistently declared that among its purposes and activities are: (1) the compilation of data of value to the community; (2) the conduct of benevolent activities in the best interest of the community; (3) the promotion of social welfare; (4) the conservation and protection of the health of the public; (5) the provision of relief activities to people in its territory; and (6) the object of easing demands on charity. Furthermore, the corporate purpose statements repeatedly refer to service to those residing *in its territory,* rather than merely those who have paid a premium. BCBSKC and its predecessors articulated and carried out a purpose to serve a more far-reaching constituency than just its subscribers. Moreover, as a result of those pronouncements and the manner in which it held itself out to the public, it received the benefit of tax exempt status for thirty-three years. Under such circumstances, it may not now be heard to deny that it was organized and existed for a "public purpose."

## B. DISTRIBUTION OF ASSETS UPON DISSOLUTION

In addition to a public purpose, section 355.881(4) requires that a public benefit corporation provide for the distribution of its assets upon dissolution to a public benefit corporation, the United States, a state or a person recognized as exempt under § 501(c)(3) of the Internal Revenue Code. BCBSKC argues that the trial court erroneously determined it to be a public benefit corporation because its dissolution clause does not conform to the second prong of the statutory test. It asserts there is nothing to prevent the

corporation's board of directors from amending its articles to change the recipient of its surplus assets upon dissolution. *§ 355.556.2.* Therefore, it reasons that since it can amend its articles pertaining to distribution of assets on dissolution, it is *not* a corporation which *must* distribute to the U.S., state, a public benefit corporation, or, for that matter, any specific beneficiary.

Whether BCBSKC had the power to amend its Articles and Bylaws to change the recipient of its assets upon dissolution is irrelevant to this inquiry. All corporations have such power, and likely would do so to obtain favorable tax status, if possible. However, the intent of the statute was clearly classification of nonprofit corporations as of a date certain. Contrary to BCBSKC's position that we should analyze its dissolution provisions as amended in 1996,[9] § 355.881 provides that **July 1, 1995** is the date on which nonprofit corporations *then existing* in Missouri were to be designated "public benefit" or "mutual benefit" corporations. § 355.881 (emphasis added). Therefore, we look to the dissolution provision in effect on July 1, 1995.

By letter to the Internal Revenue Service dated July 2, 1982, BCBSKC applied for recognition of exempt status under § 501(c)(4) of the Internal Revenue Code. In that letter, counsel for BCBSKC stated:

We are aware of Announcement 82–91 (dated June 28, 1982), in which the Internal Revenue Service states that organizations which were formed under Missouri Annotated Statutes Chapter 355 must provide in their articles of incorporation a specific dissolution provision, if they are to be eligible for tax·exempt status pursuant to section 501(c) of the

---

9. In 1996, BCBSKC amended its Articles to provide that its assets would be distributed upon dissolution in accordance "with the provisions of the Bylaws of the corporation." The amended Bylaws of BCBSKC, dated May 1, 1996, provided: "In the event of liquidation of the Corporation, after payment of all other liabilities...[p]roperty, reserves and

funds of the Corporation then remaining, if any, shall be distributed pursuant to the provisions of Chapters 354 and 355, RSMo or under the direction of a court having jurisdiction thereof." We note that Chapters 354 and 355 exclude for-profit organizations and apply only to non-profit entities.

Internal Revenue Code.[10] The new organization is presently in the process of amending its articles of incorporation in response to Announcement 82–91. We will submit a copy of the amendment to your office when it has been approved by the organization's Board of Directors.

In its Revised Articles of Incorporation dated July 21, 1982, a copy of which was sent to the Internal Revenue Service, BCBSKC set forth its dissolution provision:

17. Upon dissolution of the corporation, after all liabilities and obligations have been satisfied and discharged, any excess assets shall be distributed *for one or more exempt purposes* within the meaning of Sections 501(c)(3) or 501(c)(4) of the Internal Revenue Code, or corresponding section of any future Federal tax code, or shall be distributed to the Federal government, or to a state or local government, *for a public purpose* (emphasis added).[11]

On September 22, 1982, the IRS notified BCBSKC that it had been granted tax exempt status pursuant to § 501(c)(4). BCBSKC contends that the dissolution provision in its 1982 revised Articles of Incorporation does not require that its assets be distributed upon dissolution to a public benefit corporation, the United States, a state or a person recognized as exempt under § 501(c)(3) of the IRC because the clause permits distribution to a § 501(c)(4) corporation. The Attorney General, on the other hand, maintains that the above-outlined distribution is not inconsistent with § 355.881(4) because 501(c)(4) corporations (the only variance in the BCBSKC article)[12] are organizations with charitable purposes, and therefore a subset of all qualified public benefit corporation recipients under the statute.

By requiring evidence of a specific dissolution provision before determining the tax-exempt status of a nonprofit corporation, the Internal Revenue Service demonstrated its intent that, should the corporation dissolve, all assets acquired by the tax-exempt entity remain dedicated to the purpose for which they were originally accumulated. For example, had BCBSKC's Articles required distribution to its subscribers, it would not have qualified for § 501(c)(4) status. *See Mutual Aid Assoc. of the Church of the Brethren v. U.S.*, 578 F.Supp. 1451, 1457 (D.Kan.1983).

In analyzing BCBSKC's dissolution provision, we note first that its assets must be distributed upon dissolution either for an "exempt purpose" under §§ 501(c)(3) or 501(c)(4), or to the federal, state or local government "for a public purpose." The "exempt purpose" phrase modifies the § 501(c)(3) and (c)(4) provision. The clause also requires distribution "for a public purpose." A fair and common sense reading of the clause compels the conclusion that the phrase "for a public purpose" relates to the entire distribution provision, not just to the government entities.

BCBSKC argues that under the "last antecedent rule" of statutory construction, the phrase "for a public purpose" can only be interpreted to relate to the government entities. The last antecedent rule generally requires that relative and qualifying words, phrases or clauses must be applied to the words, phrases or clauses immedi-

---

10. "An organization's assets will be considered dedicated to an exempt purpose, for example, if, upon dissolution, such assets would, by reason of a provision in the organization's articles or by operation of law, be distributed for one or more exempt purposes." *Treas. Reg. § 1.501(c)(3)–1(b)(4)* (1982).

11. This dissolution provision was part of BCBSKC's Articles on July 1, 1995, the effective date of § 355.881.

12. At the time of the adoption of the dissolution provision, BCBSKC was a 501(c)(4) corporation. In its reply to the Attorney General's Motion for Summary Judgment, BCBSKC stated that the reason for the inclusion of § 501(c)(4) corporations in the dissolution provision was to allow for the distribution of its assets upon dissolution to another Blue Cross/Blue Shield organization.

ately preceding and are not to be construed as extending to or including others more remote. *Elliott v. James Patrick Hauling, Inc.*, 490 S.W.2d 284, 287 (Mo. App. E.D.1973). Contrary to BCBSKC's contention, however, the rule is not inflexible and its use depends upon many considerations. *Id.* The best and surest test to determine whether the general rule of the last antecedent or the exception thereto is to be applied is a "common sense interpretation." *Id.* In the matter *sub judice,* if the "public purpose" limitation applied only to the governmental entities, it would be redundant because everything the government does must serve a public purpose. Accordingly, the common sense interpretation must be that the "public purpose" provision modifies each of the potential distributees named.

With this in mind, it can readily be seen that the addition of § 501(c)(4) entities to the list of potential recipients of BCBSKC's funds at dissolution does not alter the clear intent of the provision. The dissolution clause expressly limits distribution to § 501(c)(4) organizations formed not only for an *"exempt purpose"* but also *"for a public purpose."* This is the equivalent of limiting distribution to organizations or entities that would qualify as public benefit corporations, one of the specified distributees listed in § 355.881(4).

A comparison of §§ 501(c)(3) and 501(c)(4) further supports the view that inclusion of § 501(c)(4) entities in the distribution clause is not inconsistent with the provisions of the § 355.881(4). An organization established under § 501(c)(3) is confined to:

> Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, liter-

ary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

*I.R.C. § 501(c)(3).* A § 501(c)(4) entity is described, somewhat more generally, as follows:

> Civic leagues or organizations not organized for profit but operated *exclusively for the promotion of social welfare,* or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality, and *the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes.*

*I.R.C. § 501(c)(4)* (emphasis added).

From these definitions, it is clear that the addition of § 501(c)(4) entities that will use the assets only for exempt and public purposes to the list of potential recipients of BCBSKC's funds at dissolution does not alter the intent or character of the distribution provision, which articulated a goal that the assets continue to serve an exempt and public purpose.[13] The dissolution clause is consistent with the distribution provisions of § 355.881(4), as well as the overall statutory concept of a public benefit corporation.

> "[P]ublic benefit corporations" [are] formed for a public or charitable purpose that serve the interests of society in a broad sense without economic benefit to their benefactors. These organizations generally will invest their assets for profit, but the profits will and must be devoted to its al-

---

**13.** Consistent with this Opinion, while noting that the Act does not distinguish between public benefit and mutual benefit nonprofit corporations, one treatise relating to Missouri nonprofit corporations differentiates between "public benefit corporations" and "mutual benefit corporations" as follows:

## CONCLUSION

The trial court did not err in finding that the dissolution provision in effect on July 1, 1995 met the statutory requirements of § 355.881(4), which, in conjunction with a finding that BCBSKC had a public purpose, qualified BCBSKC as a public benefit corporation.

The trial court's denial of BCBSKC's motion for summary judgment and partial grant of summary judgment in favor of the Attorney General is affirmed.

BRECKENRIDGE, Chief Judge, SPINDEN, SMART, LAURA DENVIR STITH, EDWIN H. SMITH, HOWARD, NEWTON, HOLLIGER, Judges, and MARTIN, Special Judge, concur.

ULRICH, Judge, heard oral argument but recused himself thereafter and did not participate in the decision.

truistic purposes and goals. The second category are "mutual benefit corporations" such as civic leagues or social clubs formed to provide benefits to their members but not to make cash or financial distributions to their members *except upon dissolution.*

PHILIP G. LOUIS, JR. AND FRANK C. BROWN, MISSOURI PRACTICE vol. 26, 155–56 (1993) (emphasis added).