51 S.W.3d 64 (2001)
FRIENDS OF AGRICULTURE FOR THE REFORM OF MISSOURI ENVIRONMENTAL REGULATIONS, ("FARMER") an unincorporated association;
Missouri AG Industries Council, Inc., Missouri Dairy Association, and Missouri Pork Producers Association, as members of FARMER, as representatives of the members of FARMER and as representatives of their own association's members;
James Russell, in capacity as a Director of FARMER, as Executive Director of Missouri AG Industries Council, Inc., and as an individual taxpayer;
David Drennan, in the capacity as a Director of FARMER, as Executive Director of Missouri Dairy Association, and as an individual taxpayer;
Don Nikodim, in the capacity as a Director of FARMER, as Executive Director of Missouri Pork Producers Association, and as an individual taxpayer, Appellants,
v.
David ZIMMERMAN; Barry Kayes, Chairperson, Missouri Air Conservation Commission, Respondent.
No. WD 58901.
Missouri Court of Appeals, Western District.
April 17, 2001.
Motion for Rehearing and/or Transfer Denied May 29, 2001.
Application for Transfer Denied August 21, 2001.
*66 Stephen G. Jeffery, Kansas City, for appellant.
Timothy P. Duggan, Jefferson City, for respondent.
Before ULRICH, P.J., EDWIN H. SMITH and NEWTON, JJ.
Motion for Rehearing and/or Transfer to Supreme Court Denied May 29, 2001.
NEWTON, Judge.
I. INTRODUCTION
A. Background
The Clean Air Act (the Act) was enacted by the United States Congress on December 17, 1963. With the Clean Air Amendments of 1970, Congress enacted a comprehensive national program that made the federal government partners with the states in the fight against air pollution, requiring the Environmental Protection Agency (the EPA) Administrator to promulgate national ambient air quality standards (NAAQS) for certain pollutants.[1] Shortly thereafter, each state was to submit a state implementation plan (SIP) for each designated "air quality control region" within their borders for the implementation, maintenance, and enforcement *67 of the NAAQS.[2] The SIP must specify emission limitations and other measures necessary for that region to meet and maintain the required NAAQS.[3] Finally, the EPA was required to act upon a proposed SIP within four months.[4] After a public notice and comment period, the Administrator was directed to approve the SIP if he determined that it met various substantive requirements under the Act.[5]
With the Clean Air Act, Congress intended to promote federalism and encourage experimentation in environmental regulation.[6] Under the federal law, the standards set forth are only minimum standards, and the states remain free to impose more stringent standards with or without EPA approval.[7] This frees the states to carry out the important role of laboratories in our federal system.[8]
This state enacted the Missouri Air Conservation Law in 1965.[9] Section 643.030 created the Missouri Air Conservation Commission (Commission) "to maintain purity of the air resources of the state ... through the prevention, abatement and control of air pollution by all practical and economically feasible methods."[10] With this purpose, the Commission is vested with rulemaking authority under Section 643.050, originally enacted in 1965, and amended in 1972, 1992, 1993, and once again in 1995. Currently, the first subsection states:
In addition to any other powers vested in it by law the commission shall have the following powers:
(1) Adopt, promulgate, amend and repeal rules and regulations consistent with the general intent and purposes of sections 643.010 to 643.190, chapter 536, RSMo, and Titles V and VI of the federal Clean Air Act, as amended, 42 U.S.C. § 7661, et seq., including but not limited to:
(a) Regulation of use of equipment known to be a source of air contamination;
(b) Establishment of maximum quantities of air contaminants that may be emitted from any air contaminant source; and
(c) Regulations necessary to enforce the provisions of Title VI of the Clean Air Act, as amended, 42 U.S.C. § 7671, et seq., regarding any Class I or Class II substances as defined therein;[11]
*68 When faced with the possibility of losing federal highway funds, the legislature passed § 643.055 in 1979 to insure compliance with the federal act.[12] At the same time, however, the statute prohibits the Commission from adopting rules or regulations that are either stricter than required by federal law or enforceable sooner than federal law.[13] The statute provides, in relevant part:
Other provisions of law notwithstanding, the Missouri air conservation commission shall have the authority to promulgate rules and regulations, pursuant to chapter 536, RSMo, to establish standards and guidelines to ensure that the state of Missouri is in compliance with the provisions of the federal Clean Air Act, as amended (42 U.S.C. § 7401, et seq.). The standards and guidelines so established shall not be any stricter than those required under the provisions of the federal Clean Air Act, as amended; nor shall those standards and guidelines be enforced in any area of the state prior to the time required by the federal Clean Air Act, as amended.[14]
"In short, § 643.050.1 provides all the rulemaking authority the Commission needs to `insure that the state of Missouri is in compliance with the provisions of the federal "Clean Air Act."' § 643.055.1."[15]
B. Missouri Hospital Association
Our first occasion to address the Commission's rulemaking authority under the Missouri Air Conservation Law was in Missouri Hospital Association.[16] The case stemmed from two rules promulgated by the Commission pertaining to waste incinerators. The circuit court found both rules to be void on two grounds: (1) the Commission failed to comply with the provisions of § 536.200 and § 536.205,[17] in promulgating and adopting the rules, and (2) because the Commission's rulemaking power was constrained by § 643.055[18], the Commission was therefore without adequate legislative authorization to adopt the two rules.[19] For these reasons, the circuit court declared both rules void.
1. Fiscal Notes, § 536.200, and § 536.205
Addressing the trial court's first ground (the "fiscal notes"), we explained:
In 1978, the General Assembly added an important element to the rulemaking process called the "fiscal note." There are two types of fiscal notes: one for rules requiring public funds to be spent *69 or redirected, governed by § 536.200; and one for rules requiring an expenditure of funds by private persons or entities, governed by § 536.205.
If a state agency proposes to adopt, amend or rescind a rule which will "require or result in an expenditure of public funds by or a reduction of public revenues for that agency" or any other state agency or political subdivision, a fiscal note is required if the change is estimated to cost "any category" of such public entities more than $500 in the aggregate. § 536.200.1. The statute mandates that the fiscal note be filed with the Secretary of State at the time the notice of proposed rulemaking is filed. Id. The fiscal note, which must estimate in detail "the cost to each affected agency or to each class of the various political subdivisions to be affected," also has to be supported with an affidavit by the director of the department to which the proposing agency belongs declaring that in his opinion the estimate is reasonably accurate. Id. Finally, § 536.200.3 requires that the "estimated cost in the aggregate" of compliance with the new, modified, or repealed rule be published in the Missouri Register contemporary with and next to the notice of proposed rulemaking. An agency's "failure to do so shall render any rule promulgated thereunder void and of no force or effect." Id.

Although its provisions are somewhat different, § 536.205 reflects a similar concern about the economic impact of rules on the private sector. It requires state agencies to file a fiscal note with the Secretary of State along with the notice of proposed rulemaking if the rule change "would require an expenditure of money by or a reduction of income for any person, firm, corporation, association, partnership, proprietorship or business entity of any kind or character" of more than $500 in the aggregate. § 536.205.1. The note must contain an estimate, by class, of the number of persons, firms, etc. which would likely be affected; a classification by type of business entity so as to give reasonable notice of the number and kind of businesses which would likely be affected; and an estimate of the aggregate cost of compliance for the likely affected entities. §§ 536.205.1(1)-(3). If a fiscal note is required due to the proposed rule's aggregate effect on private finances, § 536.205.2 mandates that the fiscal note itself be published contemporary with and next to the notice of proposed rulemaking in the Missouri Register. If the state agency fails to publish the fiscal note, "any rule promulgated thereunder [is] void and of no force and effect." Id.[20]
We found that the Commission failed to comply with both § 536.200 and § 536.205 in adopting the first of the rules at issue. The Commission failed to comply with § 536.200 because it filed neither a fiscal note nor an affidavit after a previously-filed fiscal note was officially withdrawn before the promulgation of a newer version of the rule.[21] The fiscal note was deficient under § 536.205 because there was no estimate of the number of persons, firms, corporations, etc. by class that might have been affected by adoption of the rule; there was no classification of the types of business entities that could be affected; and there was no fiscal note published in the Missouri Register contemporary with *70 and adjacent to the notice of proposed rulemaking.
Likewise, we found that it the other rule at issue was void due to the Commission's failure to comply with either § 536.200 or § 536 .205. The Commission violated § 536.200 in promulgating the rule because the Commission failed "to make a comprehensive and diligent attempt to identify and list all the state agencies and political subdivisions that would be affected thereby, and to make a reasonable, realistic, good faith effort to estimate the cost in the aggregate to each affected state agency and category of political subdivision."[22] Additionally, the private entity cost estimate at the end of the rule violated § 536.205 because the compliance costs to private entities were only estimated for two years, the year the rule was adopted and the following fiscal year.
Concluding our discussion of the fiscal notes at issue, we explained the dual purpose that fiscal notes serve:
Sections 536.200 and 536.205 are clearly designed to require agencies to take reasonable steps to consider and identify all public and private entities significantly affected by any proposed rule, and to investigate, consider and comprehensively estimate the full range of costs involved. As one commentator has observed:
The object of the fiscal note requirement is assurance that state agencies and, in turn, the legislature and the public are aware of the economic costs as well as the benefits of rulemaking actions. To achieve this, fiscal notes are required when the effect of rulemaking includes a material economic impact on public and private expenditures, public revenues and private incomes.
These requirements are not trivial. They are necessary to ensure that any agency proposing a rule adequately considers the private and public entities it will affect. At the very least, the fiscal note "force[s] the agency to think about the economic consequences of its rulemaking." Fiscal notes also serve another important purpose: to give potentially affected entities notice of the estimated financial impact a given rule might have on them. In fact, § 536.205.1(2) explicitly requires that private entities be classified "in such manner as to give reasonable notice of the number and kind of businesses which would likely be affected" by a given rule. Indeed, as our Supreme Court recently noted while discussing the general notice and comment procedures contained in § 536.021, RSMo Supp.1992:
The very purpose of the notice procedure for a proposed rule is to allow opportunity for comment by supporters or opponents of the measure, and so to induce a modification.... To neglect the notice ... or to give effect to a proposed rule before the time for comment has run ... undermines the integrity of the procedure.
If an entity potentially affected by a proposed rule sees a public notice of rulemaking reflecting no cost or minimal cost of compliance, that entity may choose not to participate in the rulemaking process. If, on the other hand, the entity anticipates substantial compliance costs, it will be far more inclined to get involved. With such participation, state agencies are more likely to adequately consider the economic impact of their rulemaking activities, better rules are *71 adopted, and public support for such rules is generated.[23]
2. Obiter Dicta and § 643.055
Noting that our holding that the rules were void was dispositive of the appeal, we went on to conclude that the Commission's rulemaking power under § 643.050,[24] was limited by § 643.055,[25] thus leaving the Commission without the authority to adopt the two rules.[26] Using fundamental principles of statutory construction, we determined "that the true intention of the General Assembly in adopting § 643.055 was to direct the Commission to make sure that Missouri was in compliance with the federal Clean Air Act...."[27] We reasoned:
As noted earlier, the limitation on the Commission's rulemaking authority is contained in the second sentence of § 643.055.1. The first sentence of the section requires the Commission to adopt standards and guidelines to ensure that Missouri is complying with the federal Clean Air Act. The second sentence says, in effect, that such standards and guidelines cannot be any stricter or be enforced sooner than those required by federal law. The meaning and effect of this provision can only be that the General Assembly has chosen to allow federal law to preempt the Commission's rulemaking authority as to areas covered by the Clean Air Act. In other words, if Congress has spoken on a particular issue in the federal Clean Air Act, the Commission is prohibited from adopting rules or regulations on that issue that are either stricter than federal law or enforceable sooner.... The Commission continues to have rulemaking authority to regulate Missouri air quality in all ways, and in all areas, not covered by the federal Clean Air Act....
* * *

It is only in areas where Congress has acted that the Commission will be implementing the EPA programs; in all other areas of air quality, the Commission will still act independently. ...[28]
C. Legislative Fallout
Ostensibly concerned that other agencies had failed to comply with the requirements for fiscal notes, the General Assembly amended the Administrative Procedure Act,[29] resulting in a qualified moratorium on the invalidity of rules for the reasons espoused in Missouri Hospital Association.[30] *72 Additionally, § 643.055 was amended to provide:
The restrictions of this section shall not apply to the parts of a state implementation plan developed by the commission to bring a nonattainment area into compliance and to maintain compliance when needed to have a United States Environmental Protection Agency approved state implementation plan. The determination of which parts of a state implementation plan are not subject to the restrictions of this section shall be based upon specific findings of fact by the air conservation commission as to the rules, regulations and criteria that are needed to have a United States Environmental Protection Agency approved plan.[31]
D. Procedural History
With this milieu, the instant case arose as a result of several regulations promulgated by the Commission in 1999. The Commission promulgated 10 CSR 10-2.070, 10 CSR 10-3.090, 10 CSR 10-4.070, and 10 CSR 10-5.160 (the "Odor Rules"); 10 CSR 10-6.010; and 10 CSR 10-6.065(4). These rules differ from federal regulations in the following ways: (1) the EPA has not implemented any federal regulations under the federal Clean Air Act imposing any regulatory requirements on odor and odorous emissions; whereas the Commission has promulgated the Odor Rules, which impose regulatory requirements concerning odors and odorous emissions from Class IA animal feeding operations; (2) the EPA has established ambient air quality standards for six compounds, but has not established an ambient air quality standard for hydrogen sulfide; whereas the Commission has adopted 10 CSR 10-6.010, which establishes an ambient air quality standard for hydrogen sulfide; and (3) the EPA requires states to require any source that has the potential to emit greater than 100 tons per year (tpy) of non-hazardous air pollutants or greater than 10 tpy of hazardous air pollutants to obtain an air operation permit, but, if a source has the potential to emit less than these thresholds, the EPA does not compel states to require the source to obtain any air operating permit; whereas the Commission has adopted 10 CSR 10-6.065(4), which requires a source that has the potential to emit less than the EPA thresholds to obtain a "basic state operating permit."
Friends of Agriculture for the Reform of Missouri Environmental Regulations (FARMER) filed its Petition in Cole County Circuit Court on August 11, 1999, challenging the validity of the Odor Rules, the ambient air rule for hydrogen sulfide, and the basic state operating permit rule. FARMER also challenged one of the Odor Rules, alleging that the Commission violated the fiscal note requirements of § 536.205. Its petition was later amended to include the additional plaintiffs, Missouri Ag Industries Council, Inc.; Missouri Dairy Association; Missouri Pork Producers Association; and their respective executive directors, James Russell, David Drennan and Don Nikodim.[32] On May 24, 2000, the trial court held that FARMER fairly and adequately represented the interests of its members and had capacity and standing to sue under Rule 52.10, and *73 that Missouri Ag Industries Council, Inc., Missouri Dairy Association, Missouri Pork Producers Association and the individual taxpayer plaintiffs all had standing. The circuit court entered partial summary judgment on four of five counts in favor of the Commission pursuant to Rule 74.01(b).[33] This appeal follows.
On appeal, FARMER contends that the Odor Rules are void because they were promulgated in violation of § 643.055.1 since the EPA does not regulate odor emissions. FARMER points out that the EPA found that it had legal authority under the Clean Air Act to regulate odors, but concluded in 1980 that federal regulatory involvement in odor control did not appear warranted at the time. Because the EPA concluded that odors and odorous emissions should not be regulated under the Clean Air Act, FARMER submits that the Odor Rules are stricter than the standards and guidelines adopted under the federal Clean Air Act. Further, because the EPA determined that regulation was not warranted "at this time," the Odor Rules are enforced in Missouri sooner than the EPA's regulation of odors and odorous emissions. For those reasons, FARMER says that the regulations violate § 643.055.1.
Secondly, FARMER argues that 10 CSR 10-3.090 is void on its face because the private entity fiscal note published in the Missouri Register when the 1999 rule amendment was proposed did not comply with § 536.205. Further, FARMER contends that the public entity fiscal note for the Odor Rules failed to make a reasonable estimate in the aggregate of private entity compliance costs as required by § 536.205. Instead of making a reasonable effort to "investigate, consider and comprehensively estimate the full range of costs involved" for the poultry and dairy industries, as required by § 536.205 and Missouri Hospital Association, FARMER advances that the Commission merely assumed that the costs were similar to those estimates associated with the swine industry. In addition, FARMER maintains that the fiscal note for the Odor Rules is facially invalid because it provided cost estimates for only five years and because a state agency must estimate total private compliance costs measured over the lifetime of the proposed rule.
Next, FARMER suggests that any air quality standard for hydrogen sulfide is prohibited by § 643.055.1 because the EPA has not created a standard for this compound. Because the EPA has established ambient air quality standards for only six compounds, which do not include hydrogen sulfide, FARMER insists that the Commission's ambient air quality rule for hydrogen sulfide in 10 CSR 10-6.010 is stricter than the federal standards. Further, because the EPA has not yet promulgated a standard for hydrogen sulfide, FARMER maintains that the Commission's ambient air rule for hydrogen sulfide is enforced in Missouri sooner than any federal standards. For those reasons, FARMER says that the regulation is invalid under § 643.055.1.
Finally, FARMER proposes that Missouri regulations that require basic state operating permits for some sources that *74 are not required to obtain operating permits under the Clean Air Act are prohibited by § 643.055.1. To support its position, FARMER contends that because the EPA does not require state-administered air operating permit programs to require sources having non-hazardous emissions below the federal regulatory threshold to obtain any air operating permits, the requirement promulgated in 10 CSR 10-6.065(4) for "basic state installations" to obtain an air operating permit is stricter than the EPA requirements. Moreover, because the regulations require sources having non-hazardous emissions below the EPA threshold to obtain air operating permits, FARMER asserts that 10 CSR 10-6.065(4) is broader than the federal standards under the Clean Air Act. Also, because the EPA does not yet require sources having non-hazardous emissions below the regulatory threshold to obtain an air operating permit, FARMER insists that 10 CSR 10-6.065(D) is enforced in Missouri sooner than any federal standard or guideline.
II. STANDARD OF REVIEW
In reviewing a grant of partial summary judgment, we examine the entire record to determine whether there is any issue of material fact and whether the moving party was entitled to judgment as a matter of law.[34] We will review the record in the light most favorable to the party against whom summary judgment was entered.[35] We accord the non-movant the benefit of all reasonable inferences from the record.[36] The propriety of summary judgment is purely an issue of law.[37] Our review is essentially de novo.[38]
III. LEGAL ANALYSIS
FARMER contends that in promulgating the Odor Rules, setting an air quality standard for hydrogen sulfide and requiring a source that has the potential to emit less than the EPA thresholds to obtain a basic state operating permit, the Commission has exceeded its authority under § 643.055. We will address these points in turn, but first we address the point FARMER raises about the fiscal note published for 10 CSR 10-3.090.
A. The Fiscal Note
When an agency intends to adopt, amend or repeal a rule that "would require an expenditure of money by, or a reduction in income for, any person, firm, corporation, association, partnership, proprietorship or business entity of any kind or character which is estimated to cost more than five hundred dollars in the aggregate," the agency must file a fiscal note along with the notice of proposed rulemaking.[39] The statute specifically sets out the contents for a valid fiscal note:
(1) An estimate of the number of persons, firms, corporations, associations, partnerships, proprietorships or business entities of any kind or character by class which would likely be affected by the adoption of the proposed rule, amendment or rescission of a rule;
(2) A classification by types of the business entities in such manner as to give reasonable notice of the number *75 and kind of businesses which would likely be affected;
(3) An estimate in the aggregate as to the cost of compliance with the rule, amendment or rescission of a rule by the affected persons, firms, corporations, associations, partnerships, proprietorships or business entities of any kind or character.[40]
Here, the rule amendment to 10 CSR 10-3.090 first appeared in the Missouri Register on December 1, 1998. The private entity fiscal note was filed with the initial version of the rule (along with the public entity fiscal note). It declared that twenty Class 1A concentrated animal feeding operations,[41] consisting of thirteen swine, six poultry and one dairy, would be affected by the adoption of the proposed rule. It gave an estimate of the private entity cost of compliance of $10,967,200 in the aggregate and calculated for a period of five years and in 1998 dollars, even though the life of the rule was expected to be more than five years. After the notice and comment period, revised fiscal notes were published with the final order of rulemaking in the Missouri Register on June 1, 1999. The rule was effective on July 30, 1999. The revised private entity fiscal note declared that the proposed rule would affect only nineteen Class 1A concentrated animal feeding operationsthirteen swine, five poultry and one dairywith an estimated cost of $25,378,490 with the same qualifications on the estimate.
The validity of the public entity fiscal note is not disputed. Instead, FARMER argues that 10 CSR 10-3.090 is void on its face because the revised private entity fiscal note published in the Missouri Register did not comply with § 536.205. FARMER contends that the private entity fiscal note for 10 CSR 10-3.090 failed to make a reasonable estimate in the aggregate of private entity compliance costs as required by § 536.205. Instead of making a reasonable effort to investigate, consider and comprehensively estimate the full range of costs involved for the poultry and dairy industries as required, FARMER advances that the Commission merely assumed that the costs were similar to those estimates associated with the swine industry. Further, FARMER maintains that the fiscal note for 10 CSR 10-3.090 is facially invalid because it provided cost estimates for only five years, and because a state agency must estimate total private compliance costs measured over the lifetime of the proposed rule.
FARMER presented no evidence in challenging the private entity fiscal note. Rather, FARMER claims that the fiscal note is facially invalid. The circuit court was provided with an affidavit by Paul Myers, the environmental specialist who prepared the challenged fiscal note, *76 and ultimately concluded that the administrators responsible for preparing the fiscal note made a comprehensive and diligent attempt to identify and list all affected private entities and made a reasonable, good faith effort to estimate the cost to those entities of compliance with the rule so long as the rule may be in effect. The evidence supports this conclusion.
Mr. Myers' affidavit showed that he made a comprehensive and diligent attempt to identify and list all affected private entities and that he made a reasonable, realistic, good faith effort to estimate the cost to those entities of compliance with the rule so long as the rule may be in effect. His investigation was thorough. He attempted to obtain cost information specific to the poultry and dairy industries, but persons he contacted were apparently not forthcoming. The studies he reviewed that provided information concerning the costs of odor controls for concentrated animal feeding operations did not distinguish between the types of animals being raised. The available studies focused on the swine industry, which, to him, appeared to provide the best information on the subject.
Although affected industries were provided three public hearings and an opportunity to submit written comments, no comments about the accuracy of the fiscal note were offered by the poultry or dairy interests. The reason for having notice and comment requirements is to provide both supporters and opponents with the opportunity for comment on a proposal and to encourage the free exchange of ideas so that the agency may become well informed on the issues.[42] FARMER agrees in its reply brief that notice and comment rulemaking is founded upon "public input and participation to produce the best possible rule."[43] Mr. Myers relied upon the comments submitted on behalf of the swine industry to publish a more accurate fiscal note with the final order of rulemaking, as required by § 536.215, and estimated the cost of compliance in the aggregate for the foreseeable future. Because the accuracy of a fiscal note is only as good as the information available, we believe that the estimate was reasonable and the product of a reasonable effort to investigate, consider and comprehensively estimate the full range of costs involved for the poultry and dairy industries. The record does not reflect that appellants suffered any detriment in their ability to participate in or react to the rulemaking process.
FARMER also contends that the Commission violated § 536.205 by merely assuming that the costs were similar to those estimates associated with the swine industry. FARMER, however, presented no evidence to the circuit court to challenge that assumption, and somehow expects us to infer that the estimates associated with the swine industry are in reality not similar to the costs involved for the poultry and dairy industries. The studies used by Mr. Myers drew no distinction between different types of concentrated animal feeding operations, and we see no need to make that distinction on our own.
Finally, FARMER attacks the fiscal note on the grounds that it provided cost estimates for only five years, although the rule is expected to exist longer than five years. In addition to the cost of compliance for the first five years that the rule is in effect, the fiscal note contains an estimated annual operational cost for a *77 typical facility for each year the rule is in effect, beginning in 2002. Because the life of the rule is unknown, we believe that the fiscal note is consistent with our holding in Missouri Hospital Association:
While preparation of aggregate cost estimates for rules which take longer to implement or are gradually phased in will obviously require more effort, we cannot say it would be impossible to do so. For example, when a rule requires periodic compliance expenditures, the fiscal note should designate the length of the period and the estimated aggregate cost of compliance during each period. The agency should attempt to estimate the cost of compliance in the aggregate for the foreseeable future. If, however, there will be ongoing costs of compliance which for some reason cannot be estimated in a reasonable fashion, an appropriately worded statement to that effect would at least put the affected entities on notice that there are significant but unquantifiable future compliance costs. The various possibilities are myriad, but we are confident that state agency administrators are capable of preparing cost estimates which comply with both the letter and spirit of §§ 536.200 and 536.205.[44]
We find that the state agency administrators here, Mr. Myers in particular, prepared cost estimates that comply with both the letter and spirit of § 536.205. The point is denied.
B. The "Odor Rules"
In February 1980, the EPA issued a report to Congress as "the response of the Environmental Protection Agency (EPA) to Section 403(b) of the 1977 Clean Air Act Amendments (P.L. 95-95), which require[d] a study of the effects of odors and odorous emissions on public health and welfare and an analysis of strategies or authorities available or appropriate under the Clean Air Act for abating such emissions."[45] After finding the authority to regulate odors, the report concluded that federal regulatory involvement was unwarranted because "[l]ocal and state odor control procedures appear to be generally adequate and are probably more cost effective than a uniform national regulatory program under the Clean Air Act."[46] To be sure, the study concluded that "Federal regulatory involvement in odor control [did] not appear to be warranted since local and State odor control procedures appear[ed] to be generally adequate."[47]
Contrary to the EPA's blessing, however, FARMER asserts that the Commission is statutorily prohibited from regulating odorous emissions because the EPA elected to not regulate the same.[48] FARMER focuses on the second sentence of § 643.055.1, which provides that "[t]he standards and guidelines so established shall not be any stricter than those required under the provisions of the federal Clean Air Act, as amended; nor shall those standards and guidelines be enforced in any area of the state prior to the time *78 required by the federal Clean Air Act, as amended." FARMER submits that the Odor Rules are stricter than the standards and guidelines adopted under the federal Clean Air Act, reasoning that the EPA's decision to not regulate odor "sets the bar at zero" and, thus, binds the Commission under § 643.055.1 to follow suit. FARMER insists that the EPA's decision not to regulate is a "guideline" under the statute. A guideline is defined as "an indication or outline of future policy or conduct (as of a government)."[49] Consequently, FARMER frames the issue as "whether the Odor Rules promulgated by the Commission are more `stringent in requirements or controls' than any `outline of policy or conduct' issued by [the] EPA under the Clean Air Act." Since the EPA has outlined a policy of not regulating odors, under FARMER's line of reasoning, the Commission is statutorily bound to follow the same course by not regulating odors.
We believe, however, the focus is more appropriately placed on the use of "required" in the statute. The Missouri Air Conservation Law does not define the word "required." Therefore we must ascertain the intent of the legislature and give effect to that intent if possible by looking to the language used and by giving words their plain and ordinary meaning.[50] When the statute fails to define a word, it is appropriate to derive the word's plain and ordinary meaning from the dictionary.[51] "Require" is defined as follows: "to impose a compulsion or command upon (as a person) to do something: demand of (one) that something be done or some action taken: enjoin, command, or authoritatively insist (that someone do something)."[52]
Section 643.055 provides that the Commission was granted rulemaking authority "to ensure that the state of Missouri is in compliance with the provisions of the federal Clean Air Act...." Bearing that in mind, "[t]he standards and guidelines so established shall not be any stricter than those required under the provisions of the federal Clean Air Act...." So, what standards and guidelines does the Clean Air Act compel or command the Commission to promulgate? According to the first sentence of the statute, the Commission is "required" to promulgate those standards and guidelines that "ensure that the state of Missouri is in compliance with the provisions of the federal Clean Air Act."[53] Compliance is synonymous with conformity.
In enacting § 643.055.1 and requiring compliance with the federal Clean Air Act, the Missouri General Assembly did not adopt the Act, but rather the statute merely reflects an intention that Missouri should follow the EPA's lead in the areas that are regulated under the Clean Air Act.[54] The General Assembly's intention was gleaned from the text of the statute in Missouri Hospital Association:
The meaning and effect of this provision can only be that the General Assembly has chosen to allow federal law to preempt the Commission's rulemaking authority as to areas covered by the federal Clean Air Act. In other words, if Congress has spoken on a particular issue in the federal Clean Air Act, the *79 Commission is prohibited from adopting rules or regulations on that issue that are either stricter than federal law or enforceable sooner.[55]
It has been explained that:
Such an approach assures the state legislature that state environmental standards are coextensive with federal law, thus allowing the state to obtain state authorization to administer the regulatory regime without risking overreaching by the state environmental agency. With the increasing complexity of federal environmental legislation, state legislatures also might embrace a general grant and general constraint approach to state enabling legislation to avoid the resource demands of learning every nuance of federal environmental legislation and the burden of drafting enabling legislation specifically matching state standards to the detailed federal mandate.[56]
We are left then with the issue of whether Congress has directly spoken on the precise issue of odors and odorous emissions. It is clear that the conscious decision at the federal level to not regulate odors is no federal mandate, and it therefore does not bind the Commission under § 643.055. Congress did speak on the issue, but the conclusion was that local and state odor control procedures appeared to be generally adequate. If Missouri law was to mirror every aspect of the Clean Air Act, both with the presence and absence of regulation, Missouri law in this area would be merely duplicative and largely unnecessary.
We believe that, by the legislature's choice of words in the statute such as "required" and "compliance," the General Assembly was focusing on affirmative regulation under the Clean Air Act. The terms connote as much. This understanding was implicit when we stated "the General Assembly has chosen to allow federal law to preempt the Commission's rulemaking authority as to areas covered by the federal Clean Air Act."[57] We do not believe that odors and odorous emissions qualifies as an area covered by the Act solely because of a report concluding that regulation of odors is better off being left to the state and local governments.
In other words, where there is affirmative regulation under the Clean Air Act, Congress has directly spoken as to the specific topic of that particular regulation, and § 643.055.1 is triggered. For example, in Corvera Abatement Technologies, Inc. v. Air Conservation Commission,[58] the Commission had promulgated a regulation concerning asbestos abatement projects, while the EPA had adopted regulations which imposed requirements on asbestos abatement in demolition projects. Our Supreme Court reiterated that § 643.055 .1 prohibits regulations containing provisions stricter than their federal counterparts and remanded for a determination as to what portions of the Commission's regulations were stricter than the federal requirements.[59] Here, however, there is no federal counterpart, and there are no standards or guidelines required for conformity with the Clean Air Act.
Finally, because the EPA determined that regulation was not warranted "at this time," FARMER also asserts the Odor *80 Rules violate § 643.055.1 because the regulations are enforced in Missouri sooner than the EPA's regulation of odors and odorous emissions. This argument must also fail for similar reasons. The second sentence of the statute concludes "nor shall those standards and guidelines be enforced in any area of the state prior to the time required by the federal Clean Air Act." As we have already established, there is no standard or guideline for odors or odorous emissions under the Clean Air Act with which the Commission is required to comply. Therefore, Congress has not spoken, and the Commission is free to act. The statute's provision "nor shall those standards and guidelines be enforced in any area of the state prior to the time required by the federal Clean Air Act" does not compel the Commission to forecast when and if Congress will speak on a particular issue and to refrain from acting until Congress has spoken. It means what it says: where Congress speaks by affirmatively regulating a specific topic under the Clean Air Act, the Commission may not enforce the particular regulations, which are required to ensure Missouri's conformity, sooner than provided under the federal regulation.
The Commission has the broad authority to promulgate rules to implement the state air conservation law. "The Commission continues to have rulemaking authority to regulate Missouri air quality in all ways, and in all areas, not covered by the federal Clean Air Act."[60] "It is only in areas where Congress has acted that the Commission [must implement the] EPA programs; in all other areas of air quality, the Commission will still act independently."[61] Because Congress has not acted, rather it has chosen a course of in action, the promulgation of the Odor Rules was a valid exercise of the Commission's power. The point is denied.
C. Hydrogen Sulfide
In federal regulations under the Clean Air Act, the EPA has established NAAQS for sulfur oxides,[62] particulate matter,[63] carbon monoxide,[64] ozone,[65] nitrogen dioxide,[66] and lead.[67] FARMER suggests that any air quality standard for hydrogen sulfide is prohibited by § 643.055.1 because the EPA has not created a standard for this compound. Because the EPA has established ambient air quality standards for only six compounds, which do not include hydrogen sulfide, FARMER insists that the Commission's ambient air quality rule for hydrogen sulfide in 10 CSR 10-6.010 is stricter than the federal standards. Further, because the EPA has not yet promulgated a standard for hydrogen sulfide, FARMER maintains that the Commission's ambient air rule for hydrogen sulfide is enforced in Missouri sooner than any federal standards. For those reasons, FARMER says that the regulation is invalid under § 643.055.1.
Again, we must ascertain whether Congress has spoken. Where there is affirmative regulation under the Clean Air Act, Congress has spoken as to the specific topic of that particular regulation, and § 643.055.1 is triggered. Here, there is affirmative regulation for six compounds, but hydrogen sulfide has been left unregulated *81 under the Clean Air Act. Congress has not directed the EPA to create a standard for hydrogen sulfide. Therefore, the Commission is not required to comply with any regulations pertaining to hydrogen sulfide, Congress has not spoken,[68] and "[t]he Commission continues to have rulemaking authority to regulate Missouri air quality in all ways, and in all areas, not covered by the federal Clean Air Act."[69] The point is denied.
D. Basic State Operating Permits
In § 502 of the Clean Air Act Amendments of 1990, Congress directed the EPA to promulgate federal regulations establishing the minimum requirements for an air operating permit program.[70] Using its authority, the EPA adopted such regulations in which the EPA has established requirements for state-administered air operating permit programs.[71] These programs require all major air emissions sources (called "Part 70 sources") to obtain operating permits. A "major source" is a source that has the potential to emit greater than 100 tons per year (tpy) of any combination of pollutants, 25 tpy or more of any combination of hazardous air pollutants, or greater than 10 tpy of hazardous air pollutants to obtain an air operation permit.[72] If a source has the potential to emit less than the 100 tpy non-hazardous emission threshold, the EPA does not compel states to require such sources to obtain any air operating permits.[73]
The Commission has established an operating permit program for sources that are "basic state installations," which are defined partly as installations that are not Part 70 installations.[74] Final approval of Missouri's operating permit program was published April 11, 1996, and it became effective on May 13, 1996.
FARMER says that Missouri's operating permit program requires sources that are not required to obtain operating permits under the Clean Air Act to obtain an operating permit and is thus prohibited by § 643.055.1. To support its position, FARMER contends that, because the EPA does not require state-administered air operating permit programs to require sources having non-hazardous emissions below the federal regulatory threshold to obtain any air operating permits, the requirement promulgated in 10 CSR 10-6.065(4) for "basic state installations" to obtain an air operating permit is stricter than the EPA requirements. Moreover, because the regulations require sources having non-hazardous emissions below the EPA threshold to obtain air operating permits, FARMER asserts that 10 CSR 10-6.065(4) is broader than the federal standards under the Clean Air Act. Finally, because the EPA does not yet require sources having non-hazardous emissions below the regulatory threshold to obtain an air operating permit, FARMER insists that 10 CSR 10-6.065(4) is enforced in Missouri sooner than any federal standard or guideline.
The key question is once again whether Congress has spoken. Where there is affirmative regulation under the Clean Air Act, Congress has spoken as to the specific topic of that particular regulation, and § 643.055.1 is triggered. Congress has spoken as to the specific emissions *82 sources of 40 CFR Part 70, and the Commission has crafted its relevant regulations to avoid conflict with the federal regulations by defining "basic state installations" to exclude any "Part 70 installation." Accordingly, basic state installations can be any installation not covered by Part 70, provided that other requirements are met, and § 643.055.1 does not direct the Commission to establish any type of permit program for basic state installations in order for Missouri law to be in compliance with the Clean Air Act. Although there is affirmative regulation under the Clean Air Act of sources under Part 70, Congress has not spoken so as to trigger § 643.055.1 with respect to basic state installations as defined by the Missouri Code of State Regulations. Where Congress regulates certain categories of sources, it has spoken only on those specific sources. Basic state installations remain unregulated under the federal Act, and the Commission is free to regulate these installations without infringing upon § 643.055.1.
Furthermore, because there is no standard or guideline under the Clean Air Act for basic state installations, § 643.055.1 does not compel the Commission to forecast when and if Congress will speak on these particular sources and to refrain from acting until Congress has spoken. Only when Congress has acted must the Commission abstain from enforcing those standards and guidelines necessary for compliance with the Act.[75] Where Congress speaks by affirmatively regulating a specific topic, such as a source or a pollutant, under the Clean Air Act, the Commission may not enforce the particular regulations, required for Missouri's conformity, sooner than provided under the federal regulation. The point is denied.
IV. CONCLUSION
After a thorough review of the record, we conclude the circuit court's ruling on the partial summary judgment is affirmed.
ULRICH, Presiding Judge, and EDWIN H. SMITH, concur.
NOTES
[1] General Motors Corp. v. U.S., 496 U.S. 530, 532-33, 110 S.Ct. 2528, 2530, 110 L.Ed.2d 480 (1990).
[2] 42 U.S.C. § 7410(a)(1).
[3] 42 U.S.C. § 7410(a)(2)(A)-(K).
[4] General Motors Corp., 496 U.S. at 533, 110 S.Ct. at 2530.
[5] 42 U.S.C. § 7410(k)(3); see Union Elec. Co. v. EPA. 427 U.S. 246, 257, 96 S.Ct. 2518, 2525, 49 L.Ed.2d 474 (1976).
[6] Jerome M. Organ, Limitations on State Agency Authority to Adopt Environmental Standards More Stringent than Federal Standards: Policy Considerations and Interpretive Problems, 54 Md.L.Rev. 1373, 1374 (1995).
[7] 42 U.S.C. § 7416; see 42 U.S.C. § 7401(a)(3) (providing that the prevention and control of air pollution at its source is to be the primary responsibility of states and local governments).
[8] "It is one of the happy incidents of the federal system that a courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." New State Ice Co. v. Liebmann, 285 U.S. 262, 311, 52 S.Ct. 371, 386-87, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting).
[9] § 643.010, RSMo 1994, et seq. Unless otherwise noted, all statutory references are to RSMo 1994.
[10] § 643.030.
[11] § 643.050.1(1).
[12] Missouri Hosp. Ass'n v. Air Conservation Comm'n, 874 S.W.2d 380, 396 (Mo.App. W.D. 1994). Compare § 643.055.1 with 42 U.S.C. § 7410(k)(3).
[13] Missouri Hosp. Ass'n, 874 S.W.2d at 396. One author has suggested that one motivation for such a statute may be explained as follows:

[One] possible explanation lies in the private sector compliance costs of increasingly complex environmental regulations. State legislatures, again, understandably may decide to protect local industry from additional compliance costs by precluding state environmental agencies from promulgating rules or regulations that impose additional demands on the regulated community. Given that state legislatures may believe that their state is competing with other states for industrial and commercial development, state legislatures also understandably may seek a competitive advantage by minimizing the state agencies' ability to impose environmental regulations. Organ, supra note 6, at 1388-89 (footnotes omitted).
[14] § 643.055.1.
[15] Missouri Hosp. Ass'n, 874 S.W.2d at 395.
[16] 874 S.W.2d 380 (Mo.App.W.D.1994).
[17] RSMo 1986.
[18] RSMo 1986.
[19] Id. at 385-86.
[20] Id. at 386-87 (footnotes omitted).
[21] We rejected the State's argument that the requirements were met when a fiscal note and affidavit were filed with the original version of the rule.
[22] Missouri Hosp. Ass'n, 874 S.W.2d. at 389.
[23] Id. at 390-91 (footnotes and citations omitted).
[24] RSMo 1986.
[25] RSMo 1986.
[26] Although the subsequent discussion in Part II of the Missouri Hospital Association opinion is technically obiter dicta, the Missouri Supreme Court expressly declined to overrule our "soundly reasoned" discussion on the issue of the Commission's authority under § 643.050 and § 643.055 and approved of our rationale in Corvera Abatement Technologies, Inc. v. Air Conservation Comm'n, 973 S.W.2d 851, 858-60 (Mo. banc 1998).
[27] Missouri Hosp. Ass'n, 874 S.W.2d at 395.
[28] Id. at 396-98 (footnotes and citations omitted) (emphasis added).
[29] The following subsections were added:

Any challenge to a rule based on failure to meet the requirements of this section shall be commenced within five years after the effective date of the rule.
In the event that any rule published prior to June 3, 1994, shall have failed to provide a fiscal note as required by this section, such agency shall publish the required fiscal note cross referenced to the applicable rule prior to August 28, 1995, and in that event the rule shall not be void. Any such rule shall be deemed to have met the requirements of this section until that date.
§§ 536.200.4-.200.5; 536.205.3-.205.4.
[30] See Assoc. Gen. Contractors of Mo. v. Dep't of Labor and Indus. Relations, 898 S.W.2d 587, 592 (Mo.App. W.D.1995) (refusing to address shortcoming of fiscal notes under § 536.200 or § 536.205 due to the "temporary legislative moratorium").
[31] § 643.055.1.
[32] Throughout the opinion, Friends of Agriculture for the Reform of Missouri Environmental Regulations and the additional plaintiffs will be referred to collectively as "FARMER."
[33] We note that an express determination that there is no just reason to delay entering judgment is not a magical incantation that miraculously transforms an otherwise unappealable judgment into a final, appealable judgment. See Hackathorn v. Four Seasons Lakesites, Inc., 959 S.W.2d 954, 957-58 (Mo.App. S.D. 1998) (finding no appealable judgment). In this case, however, the remaining count in FARMER's petition challenged 10 CSR 10-6.065(3)(D)6, regarding an agricultural exemption for permit requirements. As such, FARMER's remaining count was a totally separate claim.
[34] Dial v. Lathrop R-II School Dist., 871 S.W.2d 444, 446 (Mo. banc 1994); Rule 74.04(c)(3).
[35] ITT Commercial Fin. Corp. v. Mid-America Marine Supply Corp., 854 S.W.2d 371, 376 (Mo. banc 1993).
[36] Id.
[37] Id.
[38] Id.
[39] § 536.205.1.
[40] § 536.205.1.
[41] Section 640.703, RSMo (Supp.1999), defines a Class 1A concentrated animal feeding operation as any such operation with the capacity of seven thousand "animal units" or more. An "animal unit" is defined at 10 CSR § 20-6.300 as a unit of measurement to compare various animal types at a concentrated animal feeding operation. One "animal unit" equals: "1.0 beef feeder or slaughter animal; 0.5 horse; 0.7 dairy cow; 2.5 swine weighing over 55 pounds; 15 nursery pigs weighing less than 55 pounds; 10 sheep; 30 chicken laying hens; 60 chicken layer pullets; 55 turkeys; 100 broiler chickens or an equivalent animal unit." Thus, to be designated Class 1A, a concentrated animal feeding operation must have more than 7,000 beef feeder or slaughter cattle; 3,500 horses; 4,900 mature dairy cows; 17,500 swine each weighing over 55 pounds; 105,000 nursery pigs weighing under 55 pounds; 70,000 sheep; 210,000 chicken laying hens; 420,000 chicken layer pullets; 385,000 turkeys; 700,000 broiler chickens; or 7,000 animal unit equivalents.
[42] NME Hosps., Inc. v. Dept. of Soc. Servs., Div. of Med. Servs. ., 850 S.W.2d 71, 74 (Mo. banc 1993).
[43] Appellant's Reply to Respondent's Brief at 6.
[44] Missouri Hosp. Ass'n, 874 S.W.2d at 390 (footnote omitted) (emphasis added).
[45] George H. Wahl, Jr., U.S. Environmental Protection Agency, Regulatory Options for the Control of Odors (EPA-450/5-80-003) at 1 (1980).
[46] Id. at 5.
[47] Assessment of Hexachlorocylopentadiene as a Potentially Toxic Air Pollutant, 50 Fed.Reg. 40,154, 40,154 (1985).
[48] FARMER stresses the report's conclusion that federal regulatory involvement was not warranted at the time, while overlooking the reasoning that state and local governments were adequately handling the regulation of odors and odorous emissions.
[49] Webster's Third New International Dictionary 1009 (1971).
[50] Blue Cross and Blue Shield of Kansas City, Inc. v. Nixon, 26 S.W.3d 218, 228 (Mo.App. W.D. en banc 2000).
[51] Id.
[52] Webster's Third New International Dictionary 1929 (1971).
[53] § 643.055.1.
[54] Missouri Hosp. Ass'n, 874 S.W.2d at 396.
[55] Id.
[56] Organ, supra note 6, at 1390 (footnotes omitted); see Missouri Hosp. Ass'n, 874 S.W.2d at 397.
[57] Missouri Hosp. Ass'n, 874 S.W.2d at 396.
[58] 973 S.W.2d 851 (Mo. banc 1998).
[59] Id. at 858-60.
[60] Missouri Hosp. Ass'n, 874 S.W.2d at 397.
[61] Id. at 398.
[62] 40 C.F.R. § 50.4-.5.
[63] 40 C.F.R. § 50.6-.7.
[64] 40 C.F.R. § 50.8.
[65] 40 C.F.R. § 50.9-.10.
[66] 40 C.F.R. § 50.11.
[67] 40 C.F.R. § 50.12.
[68] See Corvera, 973 S.W.2d at 858-60.
[69] Missouri Hosp. Ass'n, 874 S.W.2d at 397.
[70] 42 U.S.C. § 7661a.
[71] 40 C.F.R. pt. 70.
[72] 40 C.F.R. § 70.2.
[73] 40 C.F.R. § 70.3.
[74] See 10 CSR 10-6.065(1).
[75] Missouri Hosp. Ass'n, 874 S.W.2d at 398.